[Nos. 25924-5-I; 29195-5-I.   Division One.   December 31, 1992.]

THE STATE OF WASHINGTON, *Respondent,* v. JERRY BIBB BALISOK, *Appellant.*

*Lorraine Lee* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Michael T.J. Hogan, Deputy,* for respondent.

BAKER, J. — The defendant appeals his conviction of attempted murder in the first degree. He argues that the information insufficiently alleged the charge, the prosecutor committed misconduct during cross examination and argument, and that the jury committed prejudicial misconduct. We reverse, holding that the jury's reenactments of the alleged criminal act constituted prejudicial misconduct requiring a new trial.

## FACTS
### Procedural History

The defendant was originally charged as "Ricky A. Wetta", with the

crime of attempted murder in the first degree, committed as follows:

That the defendant Ricky A. Wetta, in King County, Washington, on or about September 5, 1989, with premeditated intent to cause the death of another person did attempt to cause the death of Emmett Thompson, a human being[.]

The information was amended before trial to name "John Doe, aka: Ricky A. Wetta", and a second time after trial but prior to sentencing to charge "Jerry Bibb Balisok, aka Ricky A. Wetta" with the crime.

A motion in limine to exclude Ricky Wetta's use of other names or evidence of his "true" identity was granted unless the defendant opened up the issue during trial. The court instructed the parties that "any party having a second thought on a motion in limine, should address it to the Court outside the presence of the jury prior to any effort to prove what is the subject of the motion in limine."

### Substantive Facts

The defendant put down earnest money to purchase the Columbian Hotel in Wenatchee on or about June 17, 1988. The remaining balance of $31,000 was originally due August 6, 1988, but was delayed by agreement to a date in October 1988. Wetta's plan for the hotel was to obtain a loan, renovate the hotel, and negotiate with the State to house a work release facility.

In August or September 1988, Wetta met with a mortgage broker who testified that she probably advised him to shop for insurance companies and be prepared to insure the property for the loan amount sought. She recalls his loan package was much more than $1 million, and may have been up to $5 million. Wetta seemed to her to be a credible, knowledgeable and "enthusiastic borrower".

Wetta purchased $4.6 million of builders risk insurance in anticipation of the renovation project. Coverage commenced on September 8, 1988, but the project never got underway because the hotel burned down on October 6, 1988.

A local fire investigative team assisted by federal agents concluded that the fire was deliberately set with liquid accelerants.

Emmett Thompson testified that Wetta asked him and another person to burn the building so Wetta could collect the insurance money. The expected proceeds were to be $3.2 million, the appraisal value of the building. Thompson testified that he did set the fire.

In January 1989 Wetta's son filed a claim with his insurance company in the amount of $3.2 million.[1]

Wetta was federally indicted in June 1989 on a charge of conspiracy to commit arson. Thompson was not charged. After his indictment, Wetta allegedly asked Thompson to sign a false affidavit relating to the circumstances of the fire. Thompson refused. Thompson was later offered immunity in exchange for his testimony in the pending federal case.

In the state trial below, Thompson testified he met with Wetta on September 5, 1989, to discuss an unrelated mutual business venture. Wetta suggested they go target shooting. They drove to a wooded area outside Issaquah. The two walked approximately 150 yards on a trail to a target shooting area. After their shooting practice, they returned down the trail, with Thompson in front of the defendant. Thompson was carrying a rifle and ammunition bag. Thompson testified that approximately 50 yards from the trail head he heard three popping noises and felt a thud to his head. He fell to the ground and saw Wetta shoot at him again with a silver handgun. He raised his arm to shield himself and was shot again. Wetta picked up the rifle and ammunition bag. When Thompson saw the defendant start to open the rifle case, he got up and ran down the trail toward the car park area, where he received aid from bystanders.

Wetta's version of the event differed. He testified that while they were at the shooting range, Thompson started talking about disposing of someone. He had previously brought up the same subject with Wetta, referring to Dan Binford, who was testifying against Wetta on the federal charge. Thompson then told Wetta that Thompson and two other people had

---

[1]The hotel had been quitclaimed to a business owned by Wetta's wife and his son.

burned down the building. Wetta testified this was the first time he had heard of Thompson's involvement. He told Thompson that he would have to tell his lawyer in Wenatchee this fact.

Wetta testified he then prepared to leave the shooting range. Thompson carried the rifle and ammunition bag, but after some distance he asked Wetta to carry them. Wetta took the bag and after 5 or 10 steps, Thompson turned to face Wetta, holding a dagger in his hand. Wetta demonstrated with another male, whose height and weight in comparison to Thompson's were noted on the record, how Thompson lunged at him and put him in a headlock. He testified that his glasses were knocked off and that he was pushed backward against something. At that point he felt something bump up against his leg in his pocket, and realized he had a handgun that he had left in the jacket. He had not worn the jacket for some time, and had forgotten that the handgun was in the pocket.

Wetta testified that he pulled the gun out of his pocket, fired a warning shot, and then four more shots in Thompson's direction. Thompson dropped the knife. Wetta picked it up and Thompson began running toward the car.

Ed Camp, a certified firearm instructor, testified that the handgun in question was not a "Saturday night special" in the sense that that term referred to a low quality or low price weapon. The handgun was an older gun of average price and high quality for its era, but which by today's standards would not be considered good quality.

Wetta testified on direct examination regarding certain aspects of his health. He weighed approximately 330 pounds in the fall of 1989, and explained that his weight had been a problem throughout his childhood, reciting his weight at various ages. He further testified that he has a bad heart, which causes him to be short of breath frequently. Additionally, he has two compressed vertebrae in his neck, which diminishes his strength in his left arm, and four nails hold his left hip together. He further testified that his eyesight is 20/100 without his glasses.

On cross examination, the following colloquy occurred:

Q: You've talked about your health history, Mr. Wetta. You've testified that your weight, as you went through school — where did you go to school, Mr. Wetta?
MS. ENGELHARD: Objection. This isn't relevant.
THE COURT: You may answer.
Q: (Mr. Hogan, continuing) Where did you go to grade school, Mr. Wetta?
A: I refuse to answer your question.
Q: Where did you go to high school where you told us those weights?
A: I believe I got a G.E.D. in the State of Washington in 1979.
Q: But when you were a teenager, did you attend high school?
A: I refuse to answer that question also.
Q: And you used to be a professional wrestler, didn't you, Mr. Wetta?
A: And I also refuse to answer that question.

The State continued to ask questions regarding a history of professional wrestling, which Wetta continued to refuse to answer on the grounds of possible self-incrimination. Wetta objected and was overruled.

Wetta moved for a mistrial on the basis of the questions relating to his schooling and professional wrestling history. The motion was denied. The court allowed the State to question as to the wrestling history because it pertained to the self-defense issue, but disallowed further questioning regarding where the defendant attended grade school and high school, as a violation of the motion in limine regarding Wetta's identity.

On cross examination, the State had Wetta perform a second demonstration of the scuffle in the woods, with Wetta playing himself and a detective playing Thompson. The height and weight of the detective were noted. The following colloquy occurred during the demonstration:

Q: Would you demonstrate how the gun went from the back of Emmett Thompson's head, and then was able to be angled in his forearm in the position that you and Detective Mullinax just occupied?
A: I have no idea. I was looking down towards the ground.
Q: So you have no idea how that last bullet went through the forearm of Emmett Thompson?
A: I imagine it was fired from the gun.

The State next questioned Wetta as to whether he had an opportunity to tell the detective at the scene that he had heard Thompson confess to the crime with which he had been falsely charged. Wetta objected to this question and asked for a sidebar, following which he was not required to answer the question.

During closing argument, the State argued that Wetta's motive had been to remove Thompson as a witness in the federal case, that Wetta and his family stood to gain $3.2 million as a result of the fire, and that the insurance broker was going to testify in the federal case that Wetta had overinsured the building. The State further referred to the handgun as a "Saturday night special". There was no objection to any of the above arguments.

During its rebuttal argument, the State argued that federal agents had gotten involved in the investigation. Wetta's objection to this statement that it was unsupported by evidence was overruled. Next, the State argued: "The defendant puts forward what I would characterize as the wimp defense, gee, I'm so heavy, I can't do anything. Well, ladies and gentlemen, you didn't hear any medical corroboration for those claims that he made." Wetta objected that this was shifting the burden of proof to the plaintiff and the court ordered the prosecutor to "[p]roceed with argument on the evidence."

A few moments later, the prosecutor rebutted a defense argument that if trajectories had been in favor of the State, there would have been evidence to that effect, arguing as follows: "The defense put on a case — She asked you to speculate because something that you didn't hear testimony about must have been adverse to my case, but the defense put on a case — ." Wetta again objected that the State was attempting to shift the burden to the defendant. The State replied, "It doesn't change the burden. But if that evidence exists, you can bet a very thorough attorney like Ms. Engelhard would have presented it when they made a claim. It doesn't stack up." Wetta objected again; the prosecutor stated again that

the State still had the burden. The court ordered the prosecutor to "[p]roceed with the argument on the issues."

Following closing arguments, Wetta moved again for a mistrial on the grounds that the State had committed prosecutorial misconduct by attempting to shift the burden of proof to the defendant. The motion was denied.

The jury was instructed to consider only the testimony of witnesses and exhibits admitted and to disregard any evidence not admitted. It was also instructed that the burden of proof is the State's and that it never shifts to the defendant.

The defendant was convicted as charged. Following trial, Wetta obtained a certificate from a juror who declared as follows:

2. . . . We returned a verdict of guilty after approximately four hours of deliberations.

. . . .

4. During deliberations, the jurors tried to reenact the struggle as described by Mr. Wetta to test whether it could have happened that way. Several reenactments took place, including times when jurors tried on Mr. Wetta's leather jacket with the pistol in the pocket, tried to reenact the struggle and hold with another juror, and tried to pull the pistol out of the pocket and aim it in a way that would result in the pattern of bullet wounds suffered by Mr. Thompson. Although we did not have the juror playing Mr. Thompson actually hold the knife, that juror would use a slashing motion as described by Mr. Wetta.

5. While attempting these reenactments, the jurors tried to act out exactly the scene and movements described by Mr. Wetta. We discussed what he said and tried to resolve differences in recollection as best we could. We also tried to use jurors of similar size to Mr. Wetta and Mr. Thompson. We concluded we had performed the reenactment as accurately as possible.

6. Ultimately, the jurors decided from the reenactments that it was virtually impossible that the incident happened as described by Mr. Wetta.

7. These reenactments took up a good portion of one afternoon. They played a large role in our deliberations and had a strong impact on our verdict.

The defendant moved for a new trial on the basis of this certificate, alleging jury misconduct. The motion was denied.

JURY MISCONDUCT

Wetta contends that the jury's reenactment of the struggle between him and the alleged victim introduced extrinsic evidence and constituted juror misconduct, which was prejudicial to his theory of self-defense. The State replies that the jury's reenactment did not constitute the creation of extrinsic evidence, but rather was merely an examination of exhibits properly admitted, that is, the handgun, the coat, and the knife.

█ A criminal defendant has state and federal constitutional rights to trial by an impartial jury. *See Duncan v. Louisiana*, 391 U.S. 145, 149, 20 L. Ed. 2d 491, 88 S. Ct. 1444, 1447 (1968); U.S. Const. amend. 6; Const. art. 1, § 22 (amend. 10). Juries have a duty to consider only that evidence produced in open court. *See Turner v. Louisiana*, 379 U.S. 466, 472-73, 13 L. Ed. 2d 424, 85 S. Ct. 546, 549-50 (1965); WPIC 1.01A. A juror breaches this duty by the introduction of extrinsic evidence during deliberations. *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986). Where the introduction of extrinsic evidence is alleged as the basis of juror misconduct, the verdict may be impeached if the affidavits of the jurors allege facts showing misconduct, and those facts are sufficient to justify a determination that the misconduct affected the verdict. *Halverson v. Anderson*, 82 Wn.2d 746, 750, 513 P.2d 827 (1973). A new trial should be granted

if there are reasonable grounds to believe the defendant has been prejudiced. *State v. Lemieux*, 75 Wn.2d 89, 91, 448 P.2d 943 (1968). Any doubt that the misconduct affected the verdict must be resolved against the verdict. *Halverson v. Anderson*, 82 Wn.2d 746, 752, 513 P.2d 827 (1973). This is an objective inquiry into whether the extraneous evidence could have affected the jury's determinations and not a subjective inquiry into the actual effect of the evidence on the jury because the actual effect of the evidence inheres in the verdict. *Gardner v. Malone*, 60 Wn.2d 836, 841, 376 P.2d 651, 379 P.2d 918 (1962). This inquiry necessarily involves consideration of the purpose for which the extraneous evidence was interjected into the jury's deliberations. "[A] new trial must be granted unless 'it can be concluded

beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict.' " *United States v. Bagley*, 641 F.2d 1235, 1242 (9th Cir.) (quoting *Gibson v. Clanon*, 633 F.2d 851, 855 (9th Cir. 1980)[, *cert. denied*, 450 U.S. 1035 (1981).])[, *cert. denied*, 454 U.S. 942 (1981)] . . ..

*State v. Briggs*, 55 Wn. App. 44, 55-56, 776 P.2d 1347 (1989). It is improper for a juror to interject novel evidence into the deliberations because such new evidence will not have been subject to objection, cross examination, explanation, or rebuttal by either party. *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 270, 796 P.2d 737 (1990) (quoting *Lockwood v. AC&S, Inc.*, 44 Wn. App. 330, 357-58, 722 P.2d 826 (1986), *aff'd*, 109 Wn.2d 235, 744 P.2d 605 (1987)), *review denied*, 116 Wn.2d 1014 (1991).

██ A trial court's ruling on a motion for new trial will not be reversed unless there is a showing of abuse of discretion. *State v. Crowell*, 92 Wn.2d 143, 594 P.2d 905 (1979). However, greater deference is owed a decision to grant a new trial than a decision to deny one. *State v. Cummings*, 31 Wn. App. 427, 430, 642 P.2d 415 (1982). A trial court abuses its discretion when its decision is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

The case of *Steadman v. Shackelton*, 52 Wn.2d 22, 322 P.2d 833 (1958) involved a jury reenactment of a traffic accident during an authorized view of the scene. In that case, the granting of a new trial was upheld where the reenactments of the accident involved the positions of certain vehicles and the point of impact, material matters which were in dispute. *Steadman*, 52 Wn.2d at 27.

In *State v. Everson*, 166 Wash. 534, 7 P.2d 603, 80 A.L.R. 106 (1932), a walking stick that had been used by a pedestrian who had allegedly been fatally struck by a passing vehicle was introduced into evidence. One of the jurors produced a magnifying glass for the purpose of examining the stick to determine whether it had been dragged in the

gravel. The court held that this conduct did not put the jury in possession of evidence that was not introduced at trial, but was merely a more critical examination of an exhibit that had been properly received into evidence. Therefore, the judgment was affirmed. *Everson*, 166 Wash. at 537.

■ This case is similar to *Steadman* and distinguishable from *Everson*. The jurors' actions in this case involved more than a critical examination of or even manipulation of objects in evidence. Rather, the reenactment of the struggle involved a utilization of those exhibits, in combination with the body sizes of the jurors involved in the reenactment, and the recollection of the jurors. This combination amounted to the creation of new evidence by the jurors which was not subject to explanation or rebuttal by either party. The juror's certificate states the purpose of the reenactment was "to test whether [the struggle] could have happened [the way Wetta described it]." Thus, the jurors were not merely evaluating and comparing their recollections of the reenactments that had been done in open court. Rather, they were engaging in an independent test of their own devising, which was outside the recorded evidence of the trial. Thus, their reenactment constituted juror misconduct. *See Richards*, 59 Wn. App. at 270.

■ Furthermore, the jury's experiment was material and prejudicial to Wetta. The reenactments consumed "a good portion of one afternoon", following which the jury returned a verdict of guilty after approximately 4 hours of deliberation. While those portions of the juror certificate stating what *effect* the experiment may have had upon the verdict must be disregarded, the facts describing the experiment and the length of time it consumed in relation to the total deliberation time do not inhere in the verdict itself. *See Halverson*, 82 Wn.2d at 749 (quoting *State v. Parker*, 25 Wash. 405, 415, 65 P. 776 (1901)). From these facts there are reasonable grounds to believe Wetta was prejudiced. We cannot conclude beyond a reasonable doubt that the jury's

reenactment of the struggle did not contribute to its determination that Wetta's self-defense theory was not credible. Resolving in favor of the defendant any doubts that the misconduct affected the verdict, and recognizing that lesser deference is owed to a decision of the trial court to deny a new trial than to grant one, we reverse and remand for a new trial.[2]

KENNEDY, J., concurs.

FORREST, J. (dissenting) — Finding no misconduct, I dissent. The majority cites no case holding that a jury's reenactment of a courtroom demonstration constitutes juror misconduct requiring a new trial, nor has my research disclosed such a case. Indeed, the closest case I found, *State v. Asherman*,[3] reached the opposite conclusion. In *Asherman* a juror surreptitiously brought into the jury room a belt and shirt which had not been introduced in evidence as exhibits and utilized them in an experiment in which one juror tried to lift another juror lying prone on the floor and carry him 5 or 6 feet. On appeal the court, while recognizing that the introduction of the belt and shirt was improper, nonetheless agreed with the trial court's conclusion that "the experiment was conducted in a manner that has reasonably been consistent with the testimony presented to the jury and merely tested the credibility of that testimony." *Asherman*, at 739. In our case the items used in the experiment had been introduced into evidence so there is even less risk of prejudice.

In the great majority of jury misconduct cases, the jury acts in violation of either the court's formal written instructions or the informal instructions given at the commencement of every criminal case. The courts should be very slow to find jury

---

[2] The remainder of this opinion has no precedential value and will not be published. *See* RCW 2.06.040.

[3] 193 Conn. 695, 478 A.2d 227 (1984), *cert. denied*, 470 U.S. 1050, 84 L. Ed. 2d 814, 105 S. Ct. 1749 (1985).

misconduct in the absence of a violation of the court's instruction, unless the alleged misconduct is clearly prejudicial. A priori, there is no reason to believe that the reenactment here would be favorable to the State rather than favorable to the defendant.[4] The jury had seen two reenactments in the courtroom. No juror brought new material or information into the jury room.[5] All the jurors could make their own evaluations of the reenactment taking into account the relative size of the individuals involved in the jury room reenactment just as they could with the courtroom reenactments. While perhaps not to be encouraged, I do not find this reenactment to be misconduct in the absence of an instruction, but rather an effort to examine the evidence properly before the jury.

In reviewing a claim of juror misconduct, in this case more accurately jury misconduct, we are not concerned with the actual impact on the individual juror's mind but on an objective evaluation as to whether the conduct in question is likely to have affected the jury's verdict. The trial judge did not so find. I find no abuse of discretion, because even assuming the reenactment constitutes jury misconduct, I do not think that it compels an inference of improper influence.

Review granted at 121 Wn.2d 1015 (1993).

---

[4] In *Marino v. Vasquez*, 812 F.2d 499 (9th Cir. 1987) the trial court authorized the jury's reenactment to test a claim that the victim had been shot in the back of the head while sitting in a corner. Although reversed for other misconduct, nonetheless, the jury room reenactment was not criticized or held to be per se prejudicial.

[5] *See, e.g., State v. Rinkes*, 70 Wn.2d 854, 425 P.2d 658 (1967) (new trial granted where a newspaper cartoon and editorial criticizing allegedly lenient decisions and liberal probation policies of certain local courts and judges were improperly included with the exhibits that entered the jury room); *Steadman v. Shackelton*, 52 Wn.2d 22, 322 P.2d 833 (1958) (new trial granted where the jury conducted experiments while viewing an accident scene that amounted to the taking of evidence on disputed matters out of court); *State v. Briggs*, 55 Wn. App. 44, 776 P.2d 1347 (1989) (new trial granted where a juror withheld information on voir dire concerning his stutter and then discussed it during deliberations in an effort to help the other jurors understand how the defendant could have committed the crime without stuttering in spite of his usual pronounced stutter).