[No. 60134-8.   En Banc.   January 13, 1994.]

THE STATE OF WASHINGTON, *Petitioner*, v. JERRY BIBB BALISOK, *Respondent*.

*Norm Maleng, Prosecuting Attorney,* and *Michael Hogan, Deputy,* for petitioner.

*Lorraine Lee* of *Washington Appellate Defender Association,* for respondent.

DURHAM, J. — Ricky Wetta[1] was convicted of attempted first degree murder. During its deliberations, the jury reenacted the crime based on the evidence admitted at trial. The Court of Appeals held that this was juror misconduct. *State v. Balisok*, 68 Wn. App. 277, 843 P.2d 1086 (1992). We reverse the Court of Appeals and reinstate the judgment and sentence.

In June 1988, Ricky Wetta purchased the Columbian Hotel in Wenatchee for approximately $135,000. On September 8, 1988, Wetta took out over $4 million in insurance on the building. On October 6, 1988, the hotel burned to the ground in a fire of suspicious origin. Wetta was indicted by a federal grand jury for conspiracy to commit arson. This indictment was based primarily on the testimony of Daniel Binford, who had been offered $10,000 by Wetta to burn down the hotel.

According to testimony at trial, however, the fire was actually set by Emmett Thompson II who was offered a share in the insurance proceeds by Wetta. Thompson testified that, after extensive discussions with Wetta, including verification of the amount of insurance on the building, Thompson drove to Wenatchee in the late evening hours of October 5 or early morning hours of October 6, spread gasoline throughout the building, and lit the fire. Although Wetta was eventually indicted for conspiracy to commit arson, the federal authorities remained unaware of Thompson's involvement until after Wetta tried to kill him by shooting him in the head on September 5, 1989.

On that day, Thompson and Wetta went target shooting at Tiger Mountain outside of Issaquah armed with Wetta's custom-made rifle. Thompson testified that, on the way back to the car, he suddenly heard three "pops", realized he

---

[1]Although referred to as Ricky Wetta throughout this opinion, the respondent's real name is Jerry Bibb Balisok. He has previously been indicted on 13 counts of forgery in Huntsville, Alabama. Although a fugitive warrant was issued after he fled Alabama, the warrant and indictment were quashed in 1983 after his mother identified him and his wife as victims of the Jonestown mass suicide in Guyana. The State did not learn of Wetta's true identity until after he had been convicted.

had been shot in the head, and fell to the ground. He covered his head, and a final bullet entered his arm. Realizing that he was still alive, and that Wetta meant to kill him, Thompson got up and stumbled out of the woods, where he was helped by a couple parked at the side of the road. Thompson survived, and Wetta was arrested at the scene. While in the hospital, Thompson informed federal authorities that it was he who had set the Columbian Hotel fire at Wetta' instructions. Thompson was given immunity in exchange for his testimony against Wetta in the federal conspiracy trial.

At the trial, Wetta claimed self-defense. Wetta stated that while they were target shooting, Thompson informed him for the first time that he had set the fire. Wetta was shocked that Thompson had done this, and informed Thompson that he (Wetta) would have to tell his lawyer about this. Wetta testified that when they were almost back to the car, Thompson turned around with a dagger in his hand, told Wetta he was not going to go to prison, and started slashing at Wetta. Wetta, who at the time weighed over 300 pounds, backed away from Thompson at which point Thompson put him in a headlock, and tried to slash his throat. Wetta claimed that while he was being attacked by Thompson, he realized he had a pistol in his jacket pocket. He pulled it out, and after firing a warning shot, shot Thompson four times.

In order to aid the jury, Wetta's attorney had an associate play the part of Thompson and reenact the attack. The associate was approximately the same height and weight as Thompson. In front of the jury, the associate put Wetta in a headlock and, using a pen in lieu of a knife, attempted to slash his throat. The two of them struggled in front of the jury, and Wetta demonstrated how he removed the pistol from his pocket and shot Thompson. On cross examination, the defendant once again demonstrated his version of events in front of the jury, using a police detective to play the part of Thompson.

Wetta was found guilty of attempted murder in the first degree, and given an exceptional sentence of 240 months. Subsequently, defense counsel obtained an affidavit from the jury foreperson. The affidavit stated that:

4. During deliberations, the jurors tried to reenact the struggle as described by Mr. Wetta to test whether it could have happened that way. . . . [J]urors tried on Mr. Wetta's leather jacket with the pistol in the pocket, tried to reenact the struggle and hold with another juror, and tried to pull the pistol out of the pocket and aim it in a way that would result in the pattern of bullet wounds suffered by Mr. Thompson. . . .

5. While attempting these reenactments, the jurors tried to act out exactly the scene and movements described by Mr. Wetta. We discussed what he said and tried to resolve differences in recollection as best we could. We also tried to use jurors of similar size to Mr. Wetta and Mr. Thompson. We concluded we had performed the reenactment as accurately as possible.

Clerk's Papers (CP), at 76. After engaging in these reenactments, and discussing the evidence, the jury concluded that "it was virtually impossible that the incident happened as described by Mr. Wetta". CP, at 77. The foreperson affirmed that the reenactments played a significant part in its deliberations and had a strong impact on the verdict. The trial court considered this affidavit, but concluded that no extrinsic evidence was interjected by this reenactment. The Court of Appeals disagreed, and remanded for a new trial. We granted the Stat's petition for review on the issue of juror misconduct.

█ █ The trial court denied the motion for a new trial because it believed that the juror reenactment did not constitute extrinsic evidence. A trial court' ruling on a motion for a new trial will not be reversed on appeal unless there is a showing of abuse of discretion. *State v. Crowell*, 92 Wn.2d 143, 145, 594 P.2d 905 (1979). As a general rule, appellate courts are reluctant to inquire into how a jury arrives at its verdict. *State v. Gay*, 82 Wash. 423, 439, 144 P. 711 (1914). *See also Gardner v. Malone*, 60 Wn.2d 836, 841-43, 376 P.2d 651, 379 P.2d 918 (1962). A strong, affirmative showing of misconduct is necessary in order to overcome the policy

favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury. *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 271-72, 796 P.2d 737 (1990), *review denied*, 116 Wn.2d 1014 (1991).

Nonetheless, the consideration of novel or extrinsic evidence by a jury is misconduct and can be grounds for a new trial. *State v. Gobin*, 73 Wn.2d 206, 211-12, 437 P.2d 389 (1968). "Novel or extrinsic evidence is defined as information that is *outside all the evidence* admitted at trial, either orally or by document." (Italics ours.) *Richards*, at 270. *See also Halverson v. Anderson*, 82 Wn.2d 746, 513 P.2d 827 (1973). Such evidence is improper because it is not subject to objection, cross examination, explanation or rebuttal. *Halverson*, at 752.

■ The reenactments engaged in by the jury here did not constitute such extrinsic evidence. Primarily, it must be noted that the jury foreperson's affidavit does not show that the jury considered any evidence which was outside of, or extrinsic to, the evidence already presented at trial. *See, e.g., People v. Kurena*, 87 Ill. App. 3d 771, 776, 410 N.E.2d 277, 282 (1980) (jury experiment with a facsimile of the murder weapon not extrinsic evidence); *United States v. Hephner*, 410 F.2d 930, 936 (7th Cir. 1969) (jury experiment of having one juror cover his head and wear sunglasses not extrinsic evidence). Rather, the reenactments were entirely permissible simulations of the testimony at trial. *See* Lillian B. Hardwick & B. Lee Ware, *Juror Misconduct Law and Litigation* § 6.02[2][b], at 6-23 (1988). "[W]here the jurors attempt to re-enact the crime during their deliberations in accordance with their own recollection of the testimony, their conduct constitutes nothing more than an 'application of everyday perceptions and common sense to the issues presented in the trial.' " *People v. Harris*, 84 A.D.2d 63, 105, 445 N.Y.S.2d 520, 546, 31 A.L.R.4th 525 (1981) (quoting *People v. Brown*, 48 N.Y.2d 388, 393, 399 N.E.2d 51, 423 N.Y.S.2d 461 (1979)), *aff'd*, 57 N.Y.2d 335, 442 N.E.2d 1205, 456 N.Y.S.2d 694 (1982), *cert. denied*, 460 U.S. 1047 (1983).

We have stated a similar rule in *State v. Everson*, 166 Wash. 534, 7 P.2d 603, 80 A.L.R. 106 (1932).

> [T]he rule . . . is to the effect that, if the experiment, or what the jury has done, has the effect of putting them in possession of material facts which should have been supported by evidence upon the trial, but which was not offered, this generally constitutes such misconduct as will vitiate the verdict. But if the experiment involves merely a more critical examination of an exhibit than had been made of it in the court, there is no ground of objection.

*Everson*, at 536-37.

In the case at hand, the Court of Appeals found the jurors' reenactment of the struggle testified to, and demonstrated by, the defendant to be outside of the scope of *Everson*. Its reasoning was as follows.

> The jurors' actions in this case involved more than a critical examination of or even manipulation of objects in evidence. Rather, the reenactment of the struggle involved a utilization of those exhibits, in combination with the body sizes of the jurors involved in the reenactment, and the recollection of the jurors. This combination amounted to the creation of new evidence by the jurors which was not subject to explanation or rebuttal by either party.

*Balisok*, at 287.

However, the absence of a juror of Wetta's exact proportions to aid in the simulation is immaterial. Jurors are expected to utilize their common sense and the normal avenues of deductive reasoning to determine the truth of the facts presented. Although the actual fact of a struggle was in dispute, the description of the struggle was not. Wetta was allowed to demonstrate the struggle in the exact manner in which he verbally testified that it occurred. If he or his attorneys felt that a pertinent part of his demonstrative testimony was his exceptional size, they were given ample opportunity to bring that fact to the jury's attention during the trial. *Cf. Harris*, 84 A.D.2d at 104 (defense cannot complain about jury's reenactment when defense counsel invited jury to test defense's version of events).

Wetta's reenactment was testimonial evidence, meant specifically to be considered and examined by the jury. The jury was instructed that:

> The evidence you are to consider consists of the testimony of the witnesses and the exhibits admitted into evidence.

CP, at 40. The jury did just that. By the foreperson's own affidavit, it conducted several reenactments in order to "act out exactly the scene and movements described by Mr. Wetta". CP, at 76. The jury utilized only the exhibits admitted into evidence. The jurors' actions amounted to nothing more than a critical examination of Wetta's self-defense theory. There was no misconduct in this case.

We reverse the Court of Appeals' decision, and reinstate the jury verdict.

ANDERSEN, C.J. and UTTER, BRACHTENBACH, DOLLIVER, SMITH, GUY, JOHNSON,, and MADSEN, JJ., concur.