**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 36695**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **2011 Opinion No. 1** |
|       **Plaintiff-Respondent,** | ) |
| | ) **Filed: January 24, 2011** |
| v. | ) |
| | ) **Stephen W. Kenyon, Clerk** |
| DANIEL RAY KEYES, II, | ) |
| | ) |
|       **Defendant-Appellant.** | ) |
| | ) |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. Fred M. Gibler, District Judge.

Order denying motion for mistrial, <u>affirmed</u>.

Molly J. Huskey, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant. Justin Curtis argued.

Hon. Lawrence G. Wasden, Attorney General; Rebekah A. Cudé, Deputy Attorney General, Boise, for respondent. Rebekah A. Cudé argued.

_____

LANSING, Judge

Daniel Ray Keyes, II appeals from his conviction for first degree arson, Idaho Code § 18-802. He contends that the district court erred by denying his motion for a mistrial. We affirm.

**I.**

**BACKGROUND**

Keyes was charged with intentionally setting fire to a rented residence that he shared, until the day of the fire, with his former girlfriend. At trial, the prosecutor asked a deputy fire chief his expert opinion of the origin of the fire. Instead of responding to the question asked, the witness answered: "It's an incendiary fire. The fire was deliberately set by the defendant." Defense counsel objected and moved for a mistrial. The district court sustained the objection and immediately gave a corrective instruction to the jury, but denied the motion for a mistrial. In this appeal, Keyes asserts error in the denial of his mistrial motion.

1

## II.

### ANALYSIS

Testimony presenting an opinion that *the defendant* is the perpetrator of a charged crime is generally inadmissible. *State v. Walters*, 120 Idaho 46, 55, 57, 813 P.2d 857, 866, 868 (1990); *State v. Hester*, 114 Idaho 688, 692-96, 760 P.2d 27, 31-35 (1988); *State v. Barnes*, 147 Idaho 587, 598, 212 P.3d 1017, 1028 (Ct. App. 2009). As our Supreme Court said in *Walters*, to "allow an expert *on the cause of fires* to weigh the evidence and testify as to *who* he believes is guilty of the crime of arson, . . . would be allowing the 'expert' to leave the realm of his expertise and invade the province of the jury." *Walters*, 120 Idaho at 57, 13 P.2d at 868 (Boyle, J., concurring).[1] Thus, the district court here properly sustained the defense objection. Keyes argues, however, that in addition to sustaining his objection, the district court should have granted his motion for a mistrial. He asserts that the deputy fire chief's testimony so infected the proceedings that the only sufficient remedy was a mistrial.

Idaho Criminal Rule 29.1(a) provides, in part: "A mistrial may be declared upon motion of the defendant, when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives the defendant of a fair trial." When reviewing the denial of a motion for a mistrial, we do not examine whether the trial court reasonably exercised its discretion in light of circumstances existing when the mistrial motion was made.

> Rather, the question must be whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record. Thus, where a motion for mistrial has been denied in a criminal case, the "abuse of discretion" standard is a misnomer. The standard, more accurately stated, is one of reversible error. Our focus is upon the continuing impact on the trial of the incident that triggered the mistrial motion. The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.

*State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007); *State v. Pickens*, 148 Idaho 554, 558, 224 P.3d 1143, 1147 (Ct. App. 2010); *State v. Urquhart,* 105 Idaho 92, 95, 665 P.2d 1102, 1105 (Ct. App. 1983). Error is harmless and not reversible if the reviewing court is convinced

---

[1] Justice Boyle's concurring opinion issued on rehearing was joined by two other justices and thus presented the view of a majority of the Idaho Supreme Court.

"beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Perry*, ___ Idaho ___, ___ P.3d ___ (Dec. 7, 2010).

Reviewing the misconduct in the context of the full record, as is required by our standard of review, we hold that a mistrial was not warranted here. First, in sustaining the objection, the district court gave the jury an immediate and forceful curative instruction. The court said:

> The jury will disregard the statements of the witness attributing fault to the defendant. That's the province of the jury. The witness knows and should know and counsel should know that that is not proper for him to be stating. And you will disregard it. That is your function. That is not his function.

Where improper testimony is inadvertently introduced into a trial and the trial court promptly instructs the jury to disregard such evidence, it is ordinarily presumed that the jury obeyed the court's instruction entirely. *State v. Grantham*, 146 Idaho 490, 498, 198 P.3d 128, 136 (Ct. App. 2008). This being said, we are mindful that the introduction of an expert's opinion on the ultimate issue of "guilt" can be very damaging, *see Walters*, 120 Idaho at 59, 813 P.2d at 870 (Boyle, J., concurring), and that in a close case a corrective instruction, even one that is forceful, might be insufficient to cure the prejudicial effect of the improper opinion.

The present case, however, is not a close one. Any prejudicial impact of the expert testimony identifying Keyes as the perpetrator was negligible because Keyes admitted, at the scene and at trial, that it was his conduct that led to the fire. At trial, he testified that he had been burning items in the fireplace when the house accidently caught fire, blaming the occurrence on a defective and deteriorating firebox within the fireplace. Thus, the only real issue before the jury was whether the house fire was accidently caused by Keyes's conduct, as he contended, or whether he intentionally set it.

The State introduced compelling evidence that the fire was intentionally set, beginning with evidence of Keyes's motive for committing the crime and of his state of mind at the time. In March 2008, Keyes and his girlfriend, D.E., began living together at the duplex residence in question. Sometime in the summer of 2008 Keyes was incarcerated in the county jail. Shortly before his scheduled release, D.E. decided to move from the residence and leave Keyes, but she did not inform him of her intent. On the morning of August 10, 2008, D.E., assisted by her father, was loading up her pets and other possessions when a police officer arrived at the residence. Because there was a protective order prohibiting Keyes from having contact with D.E., the officer's purpose was to inform D.E. that Keyes was being released from custody that

3

morning. Shortly after the officer left, Keyes arrived. When D.E. told Keyes she was leaving him, he became angry, telling D.E. and her father that they had better "leave while it's still safe." D.E. and her father left within minutes, leaving behind many of her personal items and most of her clothes with the intent of returning for them later. Over the next several hours, Keyes repeatedly attempted to contact D.E. He called her cell phone and her father's cell and home phone many times, but D.E. chose not to talk to him. Keyes left a number of voice messages which started out "claiming that he did not want this to turn violent," progressed to angry and insulting, and ended with threats to D.E.'s father's life.

Keyes testified at trial that after D.E. and her father left, he bought some vodka, and then returned to the residence and sat in the living room to watch television, listen to music and relax. Keyes said that about 7 p.m. he lit a fire in the fireplace. He said that he burned mostly scrap wood that was lying around the house, but admitted to also burning some "junk mail" and some of D.E.'s personal items, including her jewelry box and its contents, and some of D.E.'s clothes. Keyes said that he eventually let the fire go out and fell asleep about 1 a.m. He testified that he awoke about 3 a.m., at which time he noticed a "glow" in the back of the fireplace chimney. Keyes said he then went to the garage, which was adjacent to the chimney, to investigate and discovered that the garage was on fire. Keyes said that he then tried to extinguish the fire by spraying water on it from a garden hose.

Other forceful evidence, however, impeached Keyes's version of the events and showed that the fire was not an accident. Notably, Keyes's cell phone records showed that he had made three calls at 2:30 a.m., at a time he had testified he was asleep. D.E. testified that when she was moving out on the day in question she was concerned for the safety of her pets because when she had left Keyes on a prior occasion, he had threatened to let her cats eat her pet birds and, later, to "roast" her pet birds if she did not immediately return to him. A chimney specialist testified that he had checked the fireplace and chimney less than ten months before the fire and found no problems. The next door neighbor in the duplex, who formerly owned a paint company, said that he smelled the distinct odor of flammable solvent around 8 p.m. on the evening in question. He said that this concerned him to the point that he went outside to investigate, and that he still smelled solvent when outside but that the odor eventually dissipated after about thirty to forty-five minutes. Shortly before 3 a.m. a passerby noticed flames shooting from the top of the house. He said that he kicked in the front door of the residence and entered the living room,

4

which was on fire in numerous locations, including the carpet. He said that there was a large burning pile of what appeared to be clothing stuffed in the fireplace. He yelled and got no response but, through a glass door, the passerby saw Keyes outside near the garage door. When he made contact, Keyes was spraying water from a garden hose on the roof of the garage. Keyes had not warned his duplex neighbor or the next door neighbor on the other side that the structure was on fire, nor had he called the fire department. The passerby got both neighbors out of their residences and one of them called 911. Shortly thereafter, Keyes got in his car and drove away at a high rate of speed. He drove to another town and did not return to the scene and speak to fire authorities for three hours. Two fire investigators presented expert testimony. Although they disagreed on the number of points of origin of the fire, both opined that the fire was intentionally set. Both agreed that one point of origin of the fire was a point four or five feet in front of the fireplace where the fire had burned a hole through the floor. One of the other possible points of origin, the garage, was completely destroyed. After the fire was extinguished, fire authorities found remnants of D.E.'s clothes, bible, notebooks, jewelry box, furniture components, remote controls, and batteries in the firebox.

In light of the overwhelming evidence that the fire was intentionally set and that Keyes had been purposefully burning D.E.'s possessions in a fit of anger, we are convinced beyond a reasonable doubt that the deputy chief's improper testimony did not contribute to the verdict obtained.[2] Therefore, the district court did not err in denying Keyes's motion for a mistrial.

The judgment of conviction is affirmed.

Judge GUTIERREZ and Judge MELANSON **CONCUR.**

---

[2] We acknowledge that in *Walters* the Supreme Court majority held that allowing an expert to opine that the defendant had committed the charged crime amounted to fundamental error which required reversal because "[w]hen fundamental error occurs in a trial, it is irrelevant whether that error would have altered the ultimate verdict of the jury." *Walters*, 120 Idaho at 59, 813 P.2d at 870. Subsequently, however, the Supreme Court has held that even fundamental error may be harmless. *State v. Severson*, 147 Idaho 694, 716, 215 P.3d 414, 436 (2009); *State v. Christiansen*, 144 Idaho 463, 471, 163 P.3d 1175, 1183 (2007); *Field*, 144 Idaho at 571, 165 P.3d at 285. Most recently, in *Perry*, ___ Idaho at ___, ___ P.3d at ___, our Supreme Court redefined the test for fundamental error, holding that a demonstration of fundamental error requires the defendant to show, among other things, that "there is a reasonable possibility that the error affected the outcome of the trial." Therefore, we regard as no longer authoritative the statement in *Walters* that allowance of expert testimony that the defendant was guilty of the charged crime requires reversal regardless of whether it would have altered the verdict of the jury.