IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 39776

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2014 Unpublished Opinion No. 428 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: March 27, 2014 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| JOSEPH ANTHONY THOMAS, JR., | ) | THIS IS AN UNPUBLISHED |
| | ) | OPINION AND SHALL NOT |
| Defendant-Appellant. | ) | BE CITED AS AUTHORITY |
| | ) | |

Appeal from the District Court of the Second Judicial District, State of Idaho, Nez Perce County. Hon. Michael J. Griffin, District Judge.

Judgment of conviction for first degree murder, affirmed.

Sara B. Thomas, State Appellate Public Defender; Diane M. Walker, Deputy Appellate Public Defender, Boise, for appellant. Diane M. Walker argued.

Hon. Lawrence G. Wasden, Attorney General; Daphne J. Huang, Deputy Attorney General, Boise, for respondent. Daphne J. Huang argued.

---

MELANSON, Judge

Joseph Anthony Thomas, Jr. appeals from his judgment of conviction for first degree murder. For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

On April 30, 2011, police dispatch received a call from Guy Arnzen (Thomas's best friend). Arnzen indicated Thomas had just confessed to strangling his ex-wife (victim). Arnzen continued that Thomas told him that Thomas could not deal with her anymore. Police responded to the victim's residence and encountered Thomas outside. Several officers went into the house while other officers secured Thomas. Inside, officers discovered the victim in the living room under a number of quilts and pillows. The victim was in a partial state of undress, with her underwear around one ankle and her t-shirt pulled above her breasts. A belt had been tightly wrapped around her neck and her body rested face down on a piece of a crib. One of the officers

1

struggled to get the belt off. When the belt finally came loose, the officer began CPR. The victim was taken to the hospital where she was pronounced dead. Officers detained Thomas and brought him in for questioning. Thomas waived his *Miranda*[1] rights and freely answered questions. Thomas denied having any knowledge of what happened to the victim.

The state charged Thomas with first degree murder. I.C. § 18-4003(a). Prior to trial, the state anticipated the defense would seek to present a theory that the victim died accidently while engaging in erotic asphyxiation.[2] The state investigated this theory and discovered three witnesses who corroborated that the victim engaged in erotic asphyxiation in the past. Two of these witnesses were female friends of the victim and related conversations where the victim stated she enjoyed being choked during sex. The other witness was the boyfriend of the victim. He stated that, on two occasions, the victim asked him to choke her during sex. The boyfriend stated that, on the first occasion, the victim moved his hand onto her neck and squeezed his hand with hers. The boyfriend stated he tried it for a bit but was uncomfortable and stopped. On the second occasion, he stated the victim asked him to choke her during sex and he refused.

The state filed a motion in limine to exclude evidence regarding the victim's prior sexual behavior. The state argued that there was no evidence that the victim was engaged in this type of behavior at the time of her death. Thomas opposed the motion, arguing the victim had a history of erotic asphyxiation and that this evidence tended to disprove the elements of premeditation and intent. The district court granted the motion on the grounds that there was no evidence the victim was engaged in sexual activity at the time of her death (with erotic asphyxiation or otherwise) and that, because the defense indicated it did not intend to pursue an alternate perpetrator defense, the only possible theory involving erotic asphyxiation would involve Thomas. Because Thomas's statements from the night of the incident did not support this

---

[1]     *See Miranda v. Arizona,* 384 U.S. 436 (1966).

[2]     Erotic asphyxiation is the practice of depleting oxygen from the brain to enhance sexual experiences and arousal. This is typically accomplished by collapsing the carotid artery. Although the terms erotic asphyxiation and autoerotic asphyxiation originally had differing meanings, they have come to be used interchangeably and were used as such below. For clarity, the term erotic asphyxiation will be used to describe the practice generally. Self-erotic asphyxiation will be used to describe engaging in the act alone and, where couples engaged in the practice, it will be described as such.

theory, the district court concluded that any evidence regarding the victim's prior sexual history was not relevant.

Thomas filed a motion for reconsideration and an accompanying affidavit. Thomas averred that he would testify at trial to the following. In the past, when he and the victim had sex, the victim requested that Thomas choke her so that she could get more enjoyment out of sex. On one occasion, Thomas walked into their bedroom and found the victim masturbating with one hand while she pulled on a necktie placed around her neck with the other hand. Thomas and the victim engaged in sexual activity shortly before her death. During this time, the victim placed a belt around her neck and she pulled on the belt during sex. The district court responded by concluding any evidence of the victim's prior sexual activities was irrelevant unless evidence was admitted at trial which would show that it was more probable than not that the victim was engaged in some form of erotic asphyxiation immediately prior to her death. The district court also indicated, that if such evidence were admitted, Thomas could offer evidence regarding erotic asphyxiation and a hearing would be held outside the presence of the jury to determine relevance.

Thomas again filed a motion for reconsideration, this time specifically articulating the evidence he desired to present regarding the victim's past sexual practices: the statements from the two female friends of the victim, the statements from the boyfriend of the victim, and the facts outlined in Thomas's affidavit. The state responded that such evidence was not relevant, its highly prejudicial nature outweighed any potential probative value, it constituted inadmissible hearsay, it was precluded by Thomas's prior motion in limine to exclude all statements made by the victim, and the proffered statements were inadmissible character evidence. The district court ruled that evidence involving prior acts of erotic asphyxiation with a partner that did not involve any type of instrument (rope, belt, tie, or other device) was not relevant and therefore excluded. However, the district court indicated Thomas could testify that he was engaged in sexual activity with the victim immediately prior to her death and, during that time, she used a belt to asphyxiate herself. The district court also ruled that Thomas could testify to a previous incident where Thomas observed the victim asphyxiating herself with a necktie while masturbating. At trial, Thomas testified to such facts in his defense. Thomas also testified to other instances of erotic asphyxiation involving the victim and that he observed the victim using a belt over twenty times in the past.

3

During deliberations, the jury sent a question to the judge that read as follows: "Did anyone other than [Thomas] lay foundation that [the victim] was, in fact, into autoerotic asphyxiation?" The district court instructed the jury to rely on their own memories as to what each witness testified to. The jury found Thomas guilty of first degree murder. Thomas moved for a new trial and the district court denied the motion. The district court sentenced Thomas to a unified term of life imprisonment, with a minimum period of confinement of twenty-five years. Thomas appeals.

## II.

## ANALYSIS

Thomas argues he was denied his constitutional right to present a defense because the district court erroneously excluded evidence that would have supported his theory of the case. The state argues that the proferred evidence was not relevant, that the prejudicial effect outweighed any probative value and that, even if the exclusion was in error, such error was harmless.

### A. Relevancy

The state argues the excluded evidence was not relevant because the circumstances of the victim's death were different from the circumstances of the proffered evidence. Specifically, the state contends that, because the proffered testimony involved erotic asphyxiation with a partner and without the use of props (belts, ties, etc.), such testimony was not relevant to Thomas's theory of the case--the victim died during self-erotic asphyxiation with the use of a belt. Thomas argues the evidence was relevant to explain how the victim injured herself and was consistent with testimony provided and the question at issue before the jury. Thomas argues that the mechanism used is not the proper focus but, rather, the act of simply depleting oxygen to the brain in order to increase sexual pleasure in general.

Evidence that is relevant to a material and disputed issue concerning the crime charged is generally admissible. *State v. Stevens*, 146 Idaho 139, 143, 191 P.3d 217, 221 (2008). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401; *see also Stevens*, 146 Idaho at 143, 191 P.3d at 221. Whether a fact is of consequence or material is determined by its relationship to the legal theories presented by the

4

parties. *State v. Johnson*, 148 Idaho 664, 671, 227 P.3d 918, 925 (2010). We review questions of relevance de novo. *State v. Raudebaugh*, 124 Idaho 758, 764, 864 P.2d 596, 602 (1993).

Here, the district court ruled that the proffered evidence was not relevant because it involved erotic asphyxiation with a partner as opposed to self-erotic asphyxiation. Furthermore, the district court ruled the evidence was not relevant because it solely involved the use of hands to achieve asphyxiation and did not involve the use of any type of instrument. Thomas's defense was that the victim accidently strangled herself while engaging in self-erotic asphyxiation with a belt. Thus, the district court determined the evidence was not relevant.

The key issue at trial was whether Thomas murdered his wife by strangulation or whether the victim accidently strangled herself while engaging in self-erotic asphyxiation. Thomas testified that, shortly before the victim's death, both engaged in sexual intercourse. Thomas testified that the victim first placed his belt around her neck. Thomas testified the victim attempted to put his hands on her neck, but he would not let her. Thomas then claimed that the victim began pulling on the belt around her neck while they had sex. Thomas denied pulling on the belt at any time while the two had sex. Thomas explained he ejaculated on the victim's leg and left the house to go sleep in his car outside. Thomas asserted that the victim continued masturbating and using the belt to asphyxiate herself. According to his testimony, while in his vehicle, Thomas experienced symptoms of restless leg syndrome, and because he had previously kept medication in the victim's home, he returned inside. It was at this time that Thomas claimed he found the victim dead.

Thomas also testified he had witnessed the victim engaging in self-erotic asphyxiation in the past while using one of his neckties, drapes, and belts. Thomas estimated he had observed the victim using a belt, either during sexual intercourse with him or during masturbation, at least twenty times. Thomas also presented expert testimony regarding erotic asphyxiation generally.

The evidence excluded by the district court would have served to give credence to Thomas's testimony that the victim engaged in erotic asphyxiation in the past and that the victim was engaged in self-erotic asphyxiation at the time of her death. The district court's ruling places too much emphasis on the distinction between erotic asphyxiation between partners and self-erotic asphyxiation and on the difference between using hands to achieve asphyxiation versus other instruments. Evidence that the victim had previously engaged in erotic asphyxiation directly corroborated Thomas's testimony that the victim engaged in this practice and this made

5

the defense's theory of how the victim died more probable than it would have been without the evidence. Therefore, the district court erred by excluding this evidence.

**B.** **Harmless Error**

The state argues that, even if the exclusion of the evidence was error, such error was harmless. Thomas contends that the state failed to meet its burden on this issue and that the jury's question demonstrates the critical nature of the excluded evidence.

In Idaho, the harmless error test established in *Chapman v. California*, 386 U.S. 18 (1967) is applied to all objected-to error. *State v. Perry*, 150 Idaho 209, 222, 245 P.3d 961, 974 (2010). Our Supreme Court, citing to *Perry*, has recently articulated the standard as follows:

> If the Court finds that the district court abused its discretion in admitting or excluding evidence, then the Court must declare a belief beyond a reasonable doubt that the error did not affect the outcome of the trial, in order to find that the error was harmless and not reversible. In other words, the error is harmless if the Court finds that the result would be the same without the error.

*State v. Almaraz*, 154 Idaho 584, 598, 301 P.3d 242, 256 (2013) (citations omitted).

> Interpreting *Chapman*, the Supreme Court of the United States has explained:
>
> To say that an error did not "contribute" to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous. . . .
> To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.

*Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overruled in part on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991). Thus, an appellate court's inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

In this case, the state presented overwhelming evidence of Thomas's guilt. Most damning was testimony from Arnzen. Arnzen testified to the following. Arnzen had been friends with Thomas for over eight years and the two worked together previously in law enforcement. On the night in question, Arnzen received text messages from Thomas indicating Thomas needed a punching bag after dealing with the victim and Thomas's current girlfriend. The messages also indicated that Thomas and Arnzen would meet at Arnzen's home. Thomas

subsequently drove to Arnzen's house to visit with him. Thomas brought alcohol and the two shared a few drinks together. At some point, Arnzen fell asleep. When Arnzen awoke after a few hours, he discovered Thomas was gone. Therefore, Arnzen went back to sleep on his couch. Arnzen testified Thomas awoke him in the middle of the night, pounding on his windows. Arnzen recognized it was Thomas and let him in the house.

Inside, Thomas told Arnzen he was about to tell him something that Arnzen was not going to like. Thomas next stated he had killed the victim. Arnzen, believing that Thomas was joking, responded, "yeah right." Thomas retorted, "no, I did." Arnzen then asked Thomas how he killed the victim and Thomas stated, "I strangled her." According to Arnzen, Thomas's stated reason for killing her was that "he just couldn't take that shit anymore." Arnzen advised Thomas that he had just made Arnzen a witness and told Thomas to call the police to turn himself in. Thomas did not respond to the statement but, instead, told Arnzen that he needed some money. Arnzen offered Thomas the money in his wallet and again told Thomas to call the police. Arnzen also told Thomas that, if Thomas would not call, Arnzen would. Thomas told Arnzen to wait because Thomas wanted to say goodbye to his boys. The 911 call from Arnzen entered into evidence is consistent with this testimony.

Furthermore, strong circumstantial evidence existed at the crime scene. The position and setting in which the police found the victim demonstrated a staged scene. The victim's underwear was around her left ankle and wet. The victim's pants were found off of her and were also wet in the crotch area. The state sent the underwear and pants to be tested for the presence of urea. Urea is a substance found in high concentrations in urine (although it is also found in soaps, creams, and moisturizers). The underwear tested positive for the presence of urea which would be consistent with the presence of urine. Despite the test not conclusively establishing the presence of urine, a reasonable inference from this evidence was that the underwear and pants were on the victim at the time she lost consciousness or died, the victim lost bladder control, and Thomas later removed them. The location of the victim's shirt also suggested a staged scene. The shirt was pulled up over the victim's breasts, but was still on her arms. A vaginal swab of the victim revealed no sperm. The prosecutor argued Thomas pulled the shirt up post-mortem but was unable to remove it over the victim's arms. This was a reasonable inference and again consistent with the theory of a staged crime scene. Furthermore, Thomas did not perform CPR upon finding the victim, nor did Thomas call 911.

Next, the victim sustained injuries that indicated a struggle occurred. The medical examiner who conducted the autopsy testified that the victim's right forehead displayed visible swelling and bruising. This was a blunt impact injury sufficient to cause breakage of blood vessels. The victim's left elbow had two areas of abrasion that were sustained recent to the time of death. The left arm had a number of bruises and contusions that varied in age from recent to older injuries. The right hand and wrist area had two contusions from two separate blunt impact sites. Consistent with the state's position that a struggle occurred, Thomas had three vertical scratch marks on his chest that appeared to be fresh.

Evidence also suggested Thomas cleaned the crime scene after the victim died. Police located a trash bag inside the front passenger side of Thomas's vehicle. Inside this trash bag, police located a blood-stained pillow that belonged to the victim, bloody disinfectant wipes, and two containers of more disinfectant wipes (with numerous remaining wipes in each container). The medical examiner testified that it is not uncommon for individuals who die by strangulation to have bloody noses.

Additionally, the police located the victim's body atop a wooden crib piece. The state surmised that Thomas dragged the victim's body atop the crib piece and planned to use it as a make-shift stretcher to remove the body from the house. Consistent with this were the scrapes on the victim's elbow. The state further argued Thomas planned to load the victim into the rear cargo area of his vehicle and that the trash was placed into the front passenger compartment to allow room for the body. Supporting this theory is Thomas's visit to Arnzen in the middle of the night. The state argued that the purpose of this visit was to recruit Arnzen's help in removing the body from the house--the last piece of evidence that Thomas could not remove by himself.

Thomas attempted to discredit Arnzen in the following ways. Thomas impeached Arnzen with a prior statement to police that Arnzen had been "popping hydrocodone." However, at trial, Arnzen testified that he had taken one-half of a hydrocodone in the morning. Thomas further impeached Arnzen with evidence Arnzen incorrectly remembered the clothing that Thomas wore that night and that Arnzen falsely remembered who had given Arnzen a number of gifts. Thomas also introduced statements from Arnzen's interview with police where Arnzen stated he was foggy and that when the police inquired whether Thomas said "I think I did" or "I did" kill the victim, Arnzen responded, "Like I said, man, I woke up at 12:30, you know, I'm not sure." Thomas testified he actually told Arnzen that he "found [the victim] and that she had been

8

strangled." Thomas also asserted he requested that Arnzen wait to call the police so that Thomas could get the boys out of the house (rather than to "say goodbye to the boys" as Arnzen testified--a statement showing consciousness of guilt).

However, Arnzen clarified that, while he was foggy when he awoke in the middle of the night, he was not foggy when Thomas entered his home. Arnzen also explained his statement that he was "not sure" as a product of feeling overwhelmed by police at the moment. Furthermore, Arnzen's 911 call is consistent with the testimony by Arnzen at trial. Arnzen testified everything was fresh in his mind at the time of the 911 call and "that's something you don't forget." Arnzen's previous experience as a law enforcement officer cannot be ignored in this respect. Arnzen retired as chief deputy of the Nez Perce County Sheriff's Office. Arnzen had been friends with Thomas for over eight years and the record reveals no motive to lie.

Thomas also attempted to explain away every piece of the state's evidence. Thomas testified the scratches on his chest were from the victim trying to grab a necklace on his chest earlier that night. Thomas explained the contusion on the victim's head by stating she was roughhousing with the kids. Thomas explained the bloody wipes and pillow in the garbage by testifying that, during the roughhousing, the victim's nose was injured and began to bleed. Thomas testified the victim cleaned the blood with disinfectant wipes and threw away her pillow. Thomas explained the crib piece being in the living room by stating he planned to take the crib the next day. Thomas explained the lack of sprem in the vaginal swab by testifying he thought the victim was off birth control and therefore he ejaculated on her leg. Thomas attempted to explain his lack of CPR and calling 911 for help by explaining he knew the victim was already gone. Thomas explained the trash in his vehicle by stating that in the past the victim had asked him to take garbage if her can was full or if it had something nasty in it because cats would crawl on the garbage.

Other evidence discredits Thomas's version of events. While detained at the scene, Thomas was placed in the back of a police car. While there, Thomas made statements indicating he thought the victim was passed out, not dead, and also implied that a "meth-head" boyfriend may have something to do with the situation. However, these statements are in direct contradiction to Thomas's explanation as to why he did not render CPR or call 911 immediately--he saw the victim's eyes and knew it was too late. While at the police station, Thomas continued to imply that some ex-boyfriend may have had something to do with the

victim's death, stating the victim had been with twenty to twenty-five men. These statements are inconsistent with his story that the victim accidently strangled herself while performing self-erotic asphyxiation.

As to the trash in Thomas's vehicle, the timing raised questions as to its verity. Thomas asserted he brought the trash out to his vehicle after he ejaculated on the victim's leg, while the victim continued to lie on the floor masturbating. Thomas's story is that he put the trash, which was too disgusting to put into the victim's trash bin, into his front passenger seat and planned to sleep right next to it in the driver's seat. As to the pillow being thrown away, the victim's mother testified that the victim had obtained it from her in junior high and that this was a special pillow to the victim. Furthermore, the location of the pillow and the bloody wipes in the trash suggest they were thrown away last. The pillow and bloody wipes were located on top of the trash which included an alcoholic drink mix Thomas claimed he and the victim shared that night. However, Thomas's story was that the pillow and bloody wipes were thrown away earlier in the day--before he and the victim used the drink mix.

Furthermore, a lack of physical evidence at the scene discredited Thomas's version of events. Thomas testified he and victim shared drinks shortly before he and the victim had sex. However, police did not locate any recently used drinking glasses. Thomas testified he and the victim had unprotected sex. However, no sperm was found when a vaginal swab was conducted on the victim. Thomas attempted to explain this away by testifying he ejaculated on the victim's leg and that the victim then wiped the ejaculate off using disinfectant wipes located by the garbage can and within reach of the bed area in the living room. However, the victim's mother testified the garbage can was kept in the backside of the kitchen--a location inconsistent with Thomas's version of events. Furthermore, no disinfectant wipes were found in the living room. The only wipes found were located inside the trash in Thomas's vehicle (although these containers of wipes in the trash still had plenty of unused ones left).

Thomas attempted to explain many of his actions after discovering the victim by stating he knew how the police would act when responding to such a call. However, Thomas's version of events was that of an accidental death. This statement is more consistent with Thomas knowing he had confessed a murder to Arnzen, knowing that Arnzen was reporting a murder to the police, and knowing how the police would be responding to *that* type of call.

10

We also note that, while the excluded evidence was relevant under I.R.E. 401, its value in support of Thomas's theory was limited. The evidence did not involve the use of an instrument and the victim had even indicated to one of her friends that it was "only hands." Additionally, the excluded evidence did not involve any incident where the victim engaged in self-erotic asphyxiation but, rather, erotic asphyxiation while engaging in intercourse with a partner. The excluded evidence indicated the victim liked to be choked by a partner using hands during sex. The excluded evidence did not indicate the victim ever engaged in self-erotic asphyxiation, let alone with the use of a belt. The error in excluding this evidence was unimportant in relation to everything else the jury considered.

While Thomas places substantial weight upon the jury's question as to whether any other witness besides Thomas established the victim was into erotic asphyxiation, this weight is misguided. The United States Supreme Court has previously stated that the reviewing court is not to consider "what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan*, 508 U.S. at 279. However, we must still assume that the jurors are rational and would not reach an irrational verdict. *See Neder v. United States*, 527 U.S. 1, 18 (1999) (articulating the inquiry as follows: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?"). When Thomas's version of events is examined in full, it is apparent it lacked any credibility. Given the overwhelming nature of the state's evidence and the nature of Thomas's testimony, we are convinced beyond a reasonable doubt that the error complained of did not affect the outcome of the trial--in other words the result would be the same without the error. Accordingly, the district court's error in excluding the evidence was harmless.[3]

### III.

### CONCLUSION

The district court erred in excluding evidence that the victim previously engaged in erotic asphyxiation. However, this error was harmless. Thus, Thomas's judgment of conviction for first degree murder is affirmed.

---

[3]    The state also argues that, even if the evidence was relevant, the prejudicial effect substantially outweighed the probative value. Given our conclusion that the error was harmless, we need not reach this issue.

Judge LANSING, **CONCURS.**

Chief Judge GUTIERREZ, **CONCURRING IN PART AND DISSENTING IN PART**.

I concur with section II, part A, and respectfully dissent from section II, part B. Although the State presented a strong case against Thomas, for purposes of analyzing harmless error, the jury's question, coupled with the jury's lengthy deliberations, demonstrate that the district court's error contributed to the verdict by impacting the jury's credibility determination.

In clarifying the *Chapman v. California*, 386 U.S. 18 (1967), harmless error standard, Justice Scalia, writing for the majority, stated that the relevant inquiry "is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). With this in mind, the jury's behavior and the length of jury deliberations in this case requires closer scrutiny.

It is important to note that an Idaho court has not explicitly stated that the jury's behavior and the length of jury deliberations should be considered in a harmless error analysis. Traditionally, Idaho appellate courts have analyzed harmless error by examining the weight of the evidence. *E.g.*, *State v. Jones*, 154 Idaho 412, 425, 299 P.3d 219, 232 (2013); *State v. Watkins*, 152 Idaho 764, 768, 274 P.3d 1279, 1283 (Ct. App. 2012); *State v. Keyes*, 150 Idaho 543, 546, 248 P.3d 1278, 1281 (Ct. App. 2011). However, other appellate courts have gone beyond weighing the evidence and have considered the jury's behavior and length of jury deliberations. *United States v. Sandoval-Gonzalez*, 642 F.3d 717, 726 (9th Cir. 2011) (stating that lengthy jury deliberations suggest a difficult case and weigh against a finding of harmless error); *United States v. Caruto*, 532 F.3d 822, 832 (9th Cir. 2008) (finding that circumstances surrounding the jury's deliberation, including the jury's request to see a copy of a report, demonstrated the error was not harmless); *United States v. Varoudakis*, 233 F.3d 113, 126 (1st Cir. 2000) (holding that lengthy deliberations suggest a difficult case and that the three-day length of the jury deliberations, along with the jury's note to the trial court that it was "at an impasse" at the end of the second half-day, weigh against a finding of harmless error); *Rhoden v. Rowland*, 172 F.3d 633, 637 (9th Cir. 1999) (determining that the disputed evidence accompanied with the nine hours of deliberation over three days suggested that the jury did not find the case to be clear cut); *Gibson v. Clanon*, 633 F.2d 851, 855 n.8 (9th Cir. 1980) (stating that although the case presented was strong, it did not seem possible that the jury would have

12

deliberated for nine hours over several days if the jurors did not have serious questions as to the credibility of the eyewitnesses); *Dallago v. United States*, 427 F.2d 546, 559 (D.C. Cir. 1969) ("The jury deliberated for five days, and one would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner."); *Allen v. United States*, 837 A.2d 917, 922 (D.C. 2003) (considering the length of the jury deliberations and jury behavior in its harmless error analysis).

In the case at hand, the jury deliberated for over nine hours. Shortly before reaching the eighth hour of deliberations, the jury inquired whether there was any evidence presented at trial that revealed whether the victim had previously engaged in erotic asphyxiation (aside from what Thomas testified to). The jury then deliberated an additional one and a half hours after the district court responded. The jury's question reveals that at least one member of the jury seriously considered Thomas's version of events, and the length of the deliberations suggests this was a difficult case. This is important because ultimately, this case required a credibility determination--whether to believe the State's or Thomas's version of events.

As the highest court of Maryland reiterated, "where credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a witness' credibility is not harmless error." *Dionas v. State*, 80 A.3d 1058, 1066 (Md. 2013). Thomas's testimony, as presented at trial, appeared entirely self-serving. The testimony from the three independent witnesses that the State had discovered would have added veracity to Thomas's testimony. Further exacerbating this error, during trial one of the investigating officers testified that he interviewed the victim's friends regarding potential sexual practices. However, the officer never indicated what the result of those interviews was. Without the evidence that the district court erroneously excluded, this lone statement implied that the State investigated Thomas's theory (that the victim died while engaging in self-erotic asphyxiation) and did not discover any evidence to support that theory. With respect to the main issue at trial-- the credibility of Thomas--it cannot be said that the excluded evidence was "unimportant in relation to everything else the jury considered on the issue." *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overruled in part on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991). Therefore, I conclude the error was not harmless.

Given this conclusion, it becomes necessary to address the State's argument that the evidence at issue should have nonetheless been excluded under Idaho Rule of Evidence 403.

13

Generally, questions of relevance and prejudice are for the district court to determine in the first instance, unless the record permits only one resolution. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 n.3 (2008) (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982)); *see also Kelley v. Southern Pacific Co.*, 419 U.S. 318, 331-32 (1974). In this case, the district court did not conduct a Rule 403 analysis, but the record permits only one resolution.

Rule 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The State argues that the excluded evidence would have been unfairly prejudicial and would have confused the issues because "evidence of proclivity to one type of 'aberrant or deviant' sex act improperly suggests proclivity to other aberrant or deviant sex acts, such as self-asphyxiation while masturbating." The State's argument is undermined by testimony the district court allowed Thomas to present at trial. Thomas testified that the victim had previously engaged in self-erotic asphyxiation and testified that the victim attempted to have him choke her during sex. The excluded evidence would not have added anything more inflammatory or confusing than what was already in the record. Furthermore, the probative value of this evidence would have been substantial. The evidence demonstrated that the victim enjoyed the practice of depleting oxygen from the brain during sexual acts to enhance arousal. This would have given some credence to Thomas's version of events. Although the State puts emphasis on the differences between erotic asphyxiation with a partner and self-erotic asphyxiation, the majority opinion properly concludes that this emphasis is misguided. Self-erotic asphyxiation is a practice that is by definition engaged in alone. Evidence of this precise practice would therefore be very difficult to come by. However, the fact that an individual engaged in the practice with a partner suggests that such individual is more likely to engage in the practice alone. Therefore, the probative value was not substantially outweighed by the danger of unfair prejudice or confusion of the issues. Accordingly, I would vacate Thomas's judgment of conviction and remand the case for a new trial.