FILED
COURT OF APPEALS
DIVISION II

2015 JAN 27 AM 8: 49

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>TIMOTHY EDWARD CHENAULT,<br><br>Appellant. | No. 44203-5-II<br><br><br><br>UNPUBLISHED OPINION |

LEE, J. — A jury found Timothy Edward Chenault guilty of second degree rape. He appeals, arguing that the trial court violated his right to present a defense by excluding evidence of the victim's history of mental illness. He also argues that the trial court erred by denying his motion for a mistrial (1) when there was an allegation of jury misconduct and (2) during the prosecutor's closing argument. Finally, he argues that the trial court improperly found that Chenault had the present or likely future ability to pay discretionary legal financial obligations. The trial court did not violate Chenault's right to present a defense because the evidence regarding the victim's history of mental illness was irrelevant, and Chenault's remaining claims lack merit. We affirm Chenault's conviction.

FACTS

On July 23, 2010, 17-year old J.A.[1] left her house in Vancouver and walked to the nearby grocery store. She met some friends, Cameron Fierro Walmsley and Damien Kennison.[2] They walked from the grocery store to a gas station to find someone to purchase alcohol for them. Fierro Walmsley's friend, Sergio Tertofsky, was at the gas station and bought Fierro Walmsley and J.A. some alcohol. J.A. got a 40-ounce can of Steel Reserve beer. J.A., Fierro Walmsley, Tertofsky, and Kennison went to a nearby wooded area ("the spot"). Cameron opened the can of Steel Reserve and J.A. drank almost the entire can immediately. J.A. got sick after drinking the beer. At some point during the evening Chenault arrived at the spot with some beer. Over the next several hours, three men had sex with J.A.: Fierro Walmsley, Chenault, and Kennison.

When J.A. did not return home for several hours, J.A.'s mother called the police. Vancouver Police Detective Dustin Nicholson called J.A.'s cell phone to try to contact her; eventually, the 911 dispatch Center was able to use the Global Positioning System in J.A.'s cell phone to locate her at a nearby elementary school. When Nicholson arrived, J.A. was hysterical. Nicholson called for an ambulance and J.A. was transported to the hospital.

At the hospital, a sexual assault nurse completed a rape kit. Nicholson took several pictures of the phone log and text messages on J.A.'s phone. He was going to take the phone as evidence,

---

[1] Because the victim was a minor at the time of the offense, we use her initials to protect her privacy. At the time of the offenses, the victim was known as J.D., but by the time of trial her initials had become J.A.

[2] Damien Kennison's first name is spelled multiple ways in the trial record.

but J.A.'s mother asked if J.A. could keep it. Nicholson agreed. Later, J.A. deleted the data from her phone. 4 RP 467.

Detective John Ringo was assigned to investigate J.A.'s sexual assault case. He interviewed Fierro Walmsley, Kennison, and Tertofsky. During the investigation, Kennison and Fierro Walmsley were able to identify Chenault as the other man who arrived at the spot. The State charged Chenault with second degree rape based on J.A. being mentally incapacitated or physically helpless.

Before trial, Chenault made a motion to get copies of J.A.'s mental health records. The trial court agreed to review the records in camera to determine whether there was anything contained in the records that would be relevant to Chenault's defense. After reviewing over 700 pages of records in camera, the trial court determined that there was nothing of relevance in the records because none of the information contained in the records was related to the underlying factual allegations of the rape or indicated a condition that would affect J.A.'s ability to remember, recall, or relate events.[3]

Chenault renewed his motion for J.A.'s mental health records or to admit evidence of her mental health history on numerous occasions. Every time Chenault brought up J.A.'s mental health records, the trial court reiterated its ruling that the records were irrelevant for numerous reasons.

At trial, J.A. testified that there were significant portions of the evening that she could not remember, although she did remember Fierro Walmsley, Chenault, and Kennison having sex with

---

[3] After the in camera review of J.A.'s mental health records, the trial court sealed the records and they are not part of the record on appeal.

her. She described her condition for most of the evening as "the lights were on and nobody was home." 6 Report of Proceedings (RP) at 766. Her arms and legs felt heavy like lead, and she didn't think she could move. When she testified specifically about Chenault, she stated she did not ask him to have sex with her and did not feel capable of participating in a sexual act.

The State presented testimony from a toxicologist who testified that J.A.'s urine sample was negative for ethanol but contained acetone, zopiclone, and oxazepam. The toxicologist testified that J.A.'s peak blood alcohol level would have been approximately 0.165, then that level would decrease by 0.015 every hour. The toxicologist determined J.A.'s blood alcohol level by applying J.A.'s sex and body weight, and the alcohol concentration of the Steel Reserve to the standardized formula for calculating blood alcohol levels. Chenault presented his own expert, Dr. Robert Julien. Dr. Julien agreed with the toxicologist's calculations of J.A.'s blood alcohol levels on the night of the rape. Dr. Julien also testified that a person cannot have an alcohol induced blackout if his or her blood alcohol level is below 0.25. And, he testified that there was not a pharmacological explanation for J.A.'s account of her condition at the time—in other words, Dr. Julien opined that the ingestion of alcohol and other drugs would not explain why she felt as though she could not move or speak, or why she only had isolated periods of memory. He testified that if a person is able to form memories he or she is conscious, alert, and active.

Russell Barnes testified that he was walking through the spot and saw Chenault with J.A. When he first saw them, he saw "a young little red head bouncing on his lap, looked like a rag doll or something." 7 RP at 937. Then he saw Chenault push J.A. off of his lap and J.A. landed face first in the dirt, but she did not move or try to get up. Chenault looked at Barnes and said, "She's all fucked up." 7 RP at 938. Later, when he walked past the spot again, Barnes saw J.A. laying

4

on the chair while Chenault was pulling up his pants. Barnes heard J.A. trying to talk, but her speech was slurred and he couldn't understand her.

Fierro Walmsley also testified at trial. He testified that J.A. became very sick after she drank the can of Steel Reserve and fell asleep after about 15-20 minutes. While Fierro Walmsley was there, "a black male" walked into the spot carrying an Earthquake beer.[4] 10 RP at 1356. The man walked up to J.A. and offered her the beer, but J.A. was asleep. Fierro Walmsley told the man to leave. Then Fierro Walmsley left to go get J.A. some food and water.[5]

Chenault also testified at trial. He testified that when he first arrived at the spot, J.A. was flirting with Kennison. He thought that J.A. was a little "tipsy," but she was not completely out of it. 9 RP at 1161. J.A. came over and sat on his lap. J.A. initiated sex by kissing him. Then, J.A. led him to the ground, stood over him, and took her leg out of her pants. They had sex with J.A. on top of him. During the entire time he was with J.A. she was never unconscious.

Before the trial concluded, the trial court notified the attorneys about a potential issue with one of the jurors. Juror 12 had asked the bailiff if they were going to get jury instructions. Juror 12's question was prompted by information that he had printed from the internet about serving on a jury. The information related to the role of the jury foreman and included information such as the jury foreman is responsible for making sure that deliberations are conducted in a civilized manner and all the jurors' voices are heard and that the jury foreman asks the jurors to vote on the verdict and fills out the verdict form. The trial court questioned the juror with the attorneys present,

---

[4] Chenault is African-American.

[5] The trial court did not allow specific testimony about Fierro Walmsley having sex with J.A. and limited Fierro Walmsley's testimony to J.A.'s condition around the time Chenault was with J.A.

and the juror stated that he had looked up the information because he had never served on a jury before, but that he had not done any research into anything else or any substantive issue on the case. The prosecutor had no objection to the juror staying on. Chenault moved for a mistrial or to have the juror replaced with the alternate. The trial court denied that motion for the mistrial because he felt the information the juror looked up was inconsequential. The trial court also declined to replace the juror with the alternate.

During closing argument, the prosecutor argued that J.A.'s physical condition at the time Chenault had sex with her indicated that she was unable to consent. The prosecutor pointed out that Barnes's testimony established that Chenault saw J.A. fall on her face and not get up. And Fierro Walmsley's testimony established that Chenault knew she was, at least at one point, sleeping or unconscious. To that end, the prosecutor stated:

> Cameron Fierro [Walmsley] told you yesterday that the first time he saw the Defendant walk through that clearing, he had—he didn't say he didn't know it was—he didn't know who it was at the time, was the only African American male that walked through that circle that day, and he describes him as drinking the exact beer the Defendant said he was drinking on the stand, I would like you to note that. He said he saw him, he had an Earthquake beer in his hand, which is exactly what the Defendant said he had. And he said that he, he walked over to [J.A.], who was passed out on this chair, and put it up to her mouth and tried to give it to her, even though this girl was basically unresponsive, and he said, "Hey, dude, get out of here."

11 RP at 1439-40. After the prosecutor's closing argument, the jury was dismissed for lunch. Then, Chenault objected to the prosecutor's statement:

> I guess I'm kind of—I'm definitely shocked and I'm extremely disappointed that [the prosecutor] would put into issue a fact that wasn't even testified to in the trial. She just told the jury that my client gave this girl alcohol. That, that was her argument in front of the jury—

11 RP at 1463. The trial court disagreed with Chenault's characterization and stated that it believed that the prosecutor argued that Chenault offered J.A. beer, not that J.A. took or consumed any of it.

Chenault also objected based on the fact that Chenault never testified that he had an Earthquake beer. The trial court ruled: "Well, you can argue that to the jury and the jury will rely on their collective memories and notes—" 11 RP at 1470. Chenault asked for a mistrial. The trial court denied the motion. In her rebuttal argument, the prosecutor made sure to clarify that she was not arguing that Chenault ever gave J.A. any alcohol.

The jury found Chenault guilty of second degree rape. At sentencing, the trial court imposed a standard range sentence and imposed legal financial obligations. The trial court did not mark the box on the judgment and sentence stating that the defendant had the present or likely future ability to pay legal financial obligations. Chenault appeals.

## ANALYSIS

A.    EVIDENCE OF J.A.'S MENTAL HEALTH HISTORY

We review a trial court's decision to exclude evidence for an abuse of discretion. *State v. Lord*, 161 Wn.2d 276, 294, 165 P.3d 1251 (2007). A trial court abuses its discretion when its decision is based on untenable grounds or untenable reasons. *Lord*, 161 Wn.2d at 283-84. Criminal defendants have a constitutional right to present evidence in their own defense. *State v. Hawkins*, 157 Wn. App. 739, 750, 238 P.3d 1226 (2010), *review denied*, 171 Wn.2d 1013 (2011). But, the evidence must be relevant; there is no constitutional right to present irrelevant evidence. *Lord*, 161 Wn.2d at 294. Relevant evidence is "evidence having any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

To convict Chenault of second degree rape, the State had to prove that Chenault engaged in sexual intercourse with J.A. when J.A. was "incapable of consent by reason of being physically helpless or mentally incapacitated." RCW 9A.44.050(1)(b). Both "mental incapacity" and "physically helpless" are statutorily defined. "Mental incapacity" means:

> that condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause.

RCW 9A.44.010(4). And, "physically helpless" means:

> a person who is unconscious or for any other reason is physically unable to communicate unwillingness to an act.

RCW 9A.44.010(5). It is a defense to second degree rape based on mental incapacity or physical helplessness if the defendant proves by a preponderance of the evidence "that at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated and/or physically helpless." RCW 9A.44.030(1).

Chenault argues that he was denied his right to present a defense because the trial court excluded evidence of J.A.'s mental health history. It appears that Chenault is making two separate arguments. First, he is arguing that the evidence regarding J.A.'s mental health history was relevant because it was an alternative explanation for her condition on the night of the rape. Second, he is arguing that it was relevant to prove his defense that he reasonably believed that she was capable of consent. Neither argument demonstrates that the trial court abused its discretion in excluding evidence of J.A.'s mental health history. Regardless of how Chenault attempts to

8

frame the issue, evidence of J.A.'s mental health history is irrelevant, and the trial court did not abuse its discretion by excluding it.

1. J.A.'s Mental Health as an Alternative Explanation

Chenault argues that the evidence regarding J.A.'s mental health history was relevant because it provided an alternative explanation for her behavior. However, this argument is predicated on the assumption that the State is obligated to prove the underlying cause of J.A.'s mental incapacity or physical helplessness. The State argues that it is not obligated to prove the underlying cause of the victim's mental incapacity or physical helplessness. Therefore, an alternative explanation for J.A.'s condition at the time of the rape was irrelevant and properly excluded. Both parties point out that the opposing party has failed to cite authority for their proposition—and with good reason. It does not appear that there is any authority discussing whether the State has the burden to prove the underlying cause of a victim's mental incapacity or physical helplessness. Based on the statutory language, we hold that the State is not required to prove the underlying cause of the victim's condition at the time of sexual intercourse. Therefore, J.A.'s mental health history was not relevant to Chenault's defense.

Statutory interpretation is a question of law we review de novo. *State v. Rice*, 180 Wn. App. 308, 313, 320 P.3d 723 (2014) (citing *State v. Franklin*, 172 Wn.2d 831, 835, 263 P.3d 585 (2011)). Our objective is to determine and give effect to the legislature's intent. *Rice*, 180 Wn. App. at 312. We give effect to the statute's plain language when the meaning can be determined from the text. *Rice*, 180 Wn. App. at 313 (citing *State v. Jones*, 172 Wn.2d 236, 242, 257 P.3d 616 (2009)). "If the statute is still susceptible to more than one interpretation after we conduct a plain meaning review, then the statute is ambiguous and we rely on statutory construction,

legislative history, and relevant case law to determine legislative intent." *Rice*, 180 Wn. App. at 313 (citing *Jones*, 172 Wn.2d at 242).

Here, the statute focuses on the victim's condition at the time of the offense—not the underlying cause of the victim's condition. Although there are no cases directly stating this proposition, *State v. Summers*, 70 Wn. App. 424, 853 P.2d 953, *review denied*, 122 Wn.2d 1026 (1993), provides some guidance.

In *Summers*, Division One of this court determined that expert testimony was not required to prove a victim was mentally incapacitated. 70 Wn. App. at 431. The court held the victim's "testimony was direct evidence of her lack of capacity and demonstrated her inability to comprehend basic facts such as the time of day, much less the nature or consequences of sexual intercourse." *Summers*, 70 Wn. App. at 430. And, the court determined that there was sufficient evidence to prove that the victim did not understand the nature or consequences of sexual intercourse based on her inability to accurately describe sexual intercourse, her inability to explain the potential consequences of sexual intercourse, and her basic lack of understanding of nonsexual matters such as the days of the week or how to tell time. *Summers*, 70 Wn. App. at 431-32. In its discussion of sufficiency of the evidence, the court did not consider *why* the victim lacked the capacity to understand the nature of consequences of sexual intercourse. In fact, at no point does the court mention what the cause of the victim's mental incapacity was.

Here, the State presented J.A.'s testimony regarding her condition at the time of the rape. Her testimony in this regard is all the State was required to present to establish whether she was mentally incapacitated or physically helpless at the time of the rape.

Chenault argues that J.A.'s mental health history is important because J.A.'s condition was not a permanent or organic condition such as a developmental disability. But the cause of a temporary condition that results in mentally incapacity or physical helplessness is no more relevant than the cause of a permanent or organic condition. For example, if the State presents evidence that a rape victim was laying on the ground unconscious at the time of the rape, it is obvious that the State would not have to prove how the victim became unconscious. The victim could have suffered a head injury, passed out from drugs or alcohol, gone into diabetic shock—the possibilities are both endless and irrelevant. The only thing that would be relevant is whether the defendant had sexual intercourse with the unconscious victim. The same is true here, how J.A. ended up in the condition in which Chenault found her is irrelevant, what matters is whether that condition resulted in mental incapacity or physical helplessness.

Finally, Chenault apparently alleges that the evidence of J.A.'s mental health history is relevant to demonstrating an alternative explanation for her overall behavior that night, rather than the specific condition in which Chenault found her. There is evidence in the record suggesting that some of J.A.'s mental health records may show that she was engaging in self-destructive and risk-taking behavior. However, such evidence is not only irrelevant, it is improper in a rape case. RCW 9A.44.020. Therefore, we consider any argument that evidence of J.A.'s mental health history should be admissible to explain her overall behavior that evening to be without merit.

2.    Chenault's Reasonable Belief

Chenault also argues that J.A.'s mental health condition was relevant to presenting his affirmative defense that he reasonably believed that J.A. was not mentally incapacitated or physically helpless. Chenault does not explain how presenting evidence of J.A.'s mental health

11

history would have any bearing on his defense that he reasonably believed J.A. was not mentally incapacitated or physically helpless.

Here, there were two accounts of J.A.'s behavior. J.A. and the other witnesses testified that she was in and out of consciousness, she was having trouble speaking coherently, she was falling down, she was vomiting, and at times she was generally unresponsive. In contrast, Chenault testified that, although it appeared J.A. had been drinking, she appeared to be functioning normally. Evidence of J.A.'s mental health history would not have changed either of those accounts of J.A.'s behavior. Either the jury found J.A. and the other witnesses credible or they believed Chenault's account. Evidence of J.A.'s mental health history would not have made it more probable that Chenault's observations were accurate, nor would it make it less probable that the jury would find J.A.'s account, and the State's witness, less credible.

Chenault had no knowledge of J.A.'s mental health history. Thus, J.A.'s mental health history could not have influenced how Chenault perceived her condition. Therefore, evidence of J.A.'s mental health history was irrelevant to Chenault's affirmative defense, and the trial court did not abuse its discretion in excluding it.

B.    JUROR MISCONDUCT

We review a trial court's decision denying a motion for a mistrial based on juror misconduct for an abuse of discretion. *State v. Balisok*, 123 Wn.2d 114, 117, 866 P.2d 631 (1994). "A strong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank, and free discussion of the evidence by the jury." *Balisok*, 123 Wn.2d at 117-18 (citing *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 271-72, 796 P.2d 737 (1990), *review denied*, 116 Wn.2d 1014 (1991)). But,

consideration of novel or extrinsic evidence constitutes juror misconduct and can require a new trial. *Balisok*, 123 Wn.2d at 118. "'Novel or extrinsic evidence is defined as information that is *outside all the evidence* admitted at trial, either orally or by document.'" *Balisok*, 123 Wn.2d at 118 (quoting *Richards*, 59 Wn. App. at 270). If there is evidence of juror misconduct, we presume the defendant is prejudiced. *State v. Boling*, 131 Wn. App. 329, 332, 127 P.3d 740, *review denied*, 158 Wn.2d 1011 (2006). However, if we conclude beyond a reasonable doubt that the extrinsic evidence did not contribute to the verdict, we will not grant a new trial. *State v. Briggs*, 55 Wn. App. 44, 56, 776 P.2d 1347 (1989).

Here, juror 12 looked up some information on the internet regarding the role of a jury foreman and how a jury conducts deliberations. Although juror 12's conduct was improper, the trial court did not abuse its discretion by denying Chenault's motion for a mistrial. The information juror 12 obtained from the internet was not extrinsic evidence. The information that the juror obtained had no bearing on any factual determination the jury was required to consider in this case. Nothing in the record indicates that the basic information regarding jury service that juror 12 found on the internet contributed to the verdict.[6] We conclude beyond a reasonable doubt that that there

---

[6] We would also note that after conducting the colloquy with juror 12 the trial court stated:

> I want to make clear for the remainder portion of this trial, nothing, absolutely nothing are you to research, look up, even if it seems like a real collateral issue, like how does a jury foreman help lead deliberations like this sheet. I don't want you—Do not tell the jury why you—the remaining panel why you were brought in here. Don't share any information off of this sheet. I recognize it's pretty kind of basic, but still—

9 RP at 1131.

was no prejudice to Chenault, and the trial court did not abuse its discretion by denying Chenault's motion for a mistrial.

## C.  PROSECUTORIAL MISCONDUCT

A defendant claiming prosecutorial misconduct bears the burden of demonstrating that the challenged conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 759-60, 278 P.3d 653 (2012). A prosecutor is allowed wide latitude in closing arguments to draw reasonable inferences from the facts in evidence and to express such inferences to the jury. *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006). However, the prosecutor's statements must be supported by the record. *State v. Ramos*, 164 Wn. App. 327, 341, 263 P.3d 1268 (2011). We review alleged misconduct "within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). We presume jurors follow the trial court's instructions. *State v. Russell*, 125 Wn.2d 24, 84, 882 P.2d 747 (1994).

Where, as here, the defendant objected at trial, he must demonstrate prejudice by showing "that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *Emery*, 174 Wn.2d at 760. "The decision to deny a request for mistrial based upon alleged prosecutorial misconduct lies within the sound discretion of the trial court, and it will not be disturbed absent an abuse of discretion." *Russell*, 125 Wn.2d at 86. A trial court abuses its discretion when its decision is based on untenable grounds or untenable reasons. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

Chenault's prosecutorial misconduct claim arises from one particular section of the prosecutor's closing argument:

> Cameron Fierro [Walmsley] told you yesterday that the first time he saw the Defendant walk through that clearing, he had—he didn't say he didn't know it was—he didn't know who it was at the time, was the only African American male that walked through that circle that day, and he describes him as drinking the exact beer the Defendant said he was drinking on the stand, I would like you to note that. He said he saw him, he had an Earthquake beer in his hand, which is exactly what the Defendant said he had. And he said that he, he walked over to [J.A.], who was passed out on this chair, and put it up to her mouth and tried to give it to her, even though this girl was basically unresponsive, and he said, "Hey, dude, get out of here."

11 RP at 1439-40. Chenault raises two specific arguments based on the prosecutor's argument. First, he argues that the trial court should have granted his motion for a mistrial because the prosecutor referred to facts not in the record by stating that Chenault testified that he had an Earthquake beer the night of the rape. Second, he argues that the trial court should have granted a mistrial because the prosecutor improperly implied that Chenault gave J.A. alcohol on the night of the rape. Both arguments lack merit, and we affirm the trial court's decision to deny Chenault's motion for a mistrial.

### 1. Reference to Earthquake Beer

The State concedes that the prosecutor's statement that Chenault testified regarding the brand of beer he had in his possession was not in the record. However, the State contends that the trial court did not abuse its discretion by denying the motion for a mistrial because there was not a substantial likelihood that the prosecutor's misstatement affected the jury's verdict.

At trial, Chenault did not dispute that he had beer with him when he went to the spot or that he had sex with J.A. The only disputes were whether J.A.'s condition rendered her incapable of consenting to sex and whether Chenault knew that J.A. was incapable of consenting to sex. Considering the issues in the case and the evidence presented at trial, the brand of beer Chenault had with him was a relatively trivial matter. There is not a substantial likelihood that the

prosecutor's misstatement affected the verdict; the trial court did not abuse its discretion by denying Chenault's motion for a mistrial.

Moreover, the jury was specifically instructed that the lawyers' statements were not evidence. And, the jury was instructed to "disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions." CP at 44. We assume that the jury followed the trial court's instructions and disregarded the prosecutor's misstatement regarding the brand of beer in Chenault's possession on the night of the rape. Thus, Chenault fails to meet his burden to show that there is a substantial likelihood that that prosecutor's misstatement affected the jury's verdict. The trial court did not abuse its discretion by denying Chenault's motion for a mistrial.

2. Prosecutor's Implication that Chenault gave J.A. alcohol

Chenault also argues that the trial court should have granted a mistrial because the prosecutor improperly implied that Chenault gave J.A. alcohol the night of the rape. He argues that the prosecutor's argument is not supported by the evidence. However, Chenault mischaracterizes the prosecutor's argument. The prosecutor's argument was an appropriate inference from Fierro Walmsley's testimony; therefore, the trial court did not abuse its discretion by denying Chenault's motion for a mistrial.

The prosecutor's argument was an accurate statement from Fierro Walmsley's testimony. Fierro Walmsley testified that before he left J.A. at the spot, he saw a black man come up and offer J.A. a beer. He then testified that J.A. did not take the beer because she was sleeping. The prosecutor did not state that Chenault actually gave J.A. the beer, and she did not state, or imply, that J.A. consumed any of it. Instead, she argued that Fierro Walmsley saw Chenault offer J.A. a

16

beer, and that J.A. did not take the beer because she was unresponsive. The prosecutor's statements were not based on facts outside the record; the statements were an accurate recitation of Fierro Walmsley's testimony combined with the reasonable inference that the black man Fierro referenced was Chenault. Accordingly, nothing in the prosecutor's argument was improper, and the trial court did not abuse its discretion by denying Chenault's motion for a mistrial.[7]

D.      CUMULATIVE ERROR

Chenault alleges that the cumulative error doctrine entitles him to relief because the combined effect of the alleged errors denied him a fair trial. "The cumulative error doctrine applies where a combination of trial errors denies the accused of a fair trial, even where any one of the errors, taken individually, would be harmless." *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014). To support a cumulative error claim the appellant must demonstrate multiple errors. *Cross*, 180 Wn.2d at 690-91.

Here, Chenault has identified a single error—the prosecutor's misstatement regarding the brand of beer Chenault had. Because there is only one error, the cumulative error doctrine does not entitle Chenault to relief.

---

[7] And, we note that any potential prejudice from the prosecutor's statement was cured by the prosecutor's rebuttal argument. During rebuttal argument the prosecutor stated: "If for some reason it appeared that I was arguing to you that Timothy Chenault gave her alcohol, that is not the argument the State was attempting to make." 11 RP at 1519. The prosecutor made it abundantly clear that she was not implying or arguing that Chenault gave J.A. any alcohol. The prosecutor's statements could not have affected the verdict because she clarified them to ensure that there was no misunderstanding. Because the prosecutor specifically told the jury that she was not in any way arguing that Chenault gave J.A. any alcohol, Chenault cannot meet his burden to show that there is a substantial likelihood that the prosecutor's comment could have affected the verdict.

E.     LEGAL FINANCIAL OBLIGATIONS

Chenault claims that the trial court erred by imposing discretionary legal financial obligations without sufficient evidence to support a finding that Chenault has the present or future ability to pay. However, Chenault has overlooked the fact that the trial court did not make a finding that Chenault has the present or likely future ability to pay legal financial obligations. The trial court is not required to make a specific or formal finding regarding the defendant's present or likely future ability to pay legal financial obligations. *State v. Curry*, 118 Wn.2d 911, 916, 829 P.2d 166 (1992).

Moreover, Chenault's claim is ultimately a claim that insufficient evidence supports a finding that Chenault has the present or likely future ability to pay legal financial obligations. A claim that the evidence is insufficient to support a finding that a defendant has the present or likely future ability to pay cannot be raised on the first time on appeal and is not ripe for review until the trial court attempts to collect payment on the legal financial obligations. *State v. Blazina*, 174 Wn. App. 906, 911, 301 P.3d 492, *review granted*, 178 Wn.2d 1010 (2013); *State v. Lundy*, 176 Wn. App. 96, 108, 308 P.3d 755 (2013). Therefore, Chenault's claim fails.

F.     SAG – INEFFECTIVE ASSISTANCE OF COUNSEL

A defendant claiming ineffective assistance of counsel has the burden to establish that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland*, 466 U.S.

at 700. Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). A defendant is prejudiced by counsel's deficient performance if there is a reasonable probability that, but for counsel's deficient performance, the outcome of the trial would have been different. *Stenson*, 132 Wn.2d at 705-06. A legitimate trial tactic or strategy cannot be the basis for an ineffective assistance of counsel claim. *State v. Grier*, 171 Wn.2d 17, 33-34, 246 P.3d 1260 (2011).

Chenault alleges that his counsel was ineffective because his counsel did not attempt to have the pictures Nicholson took of J.A.'s cell phone excluded from evidence. But, defense counsel used the photos as part of a legitimate trial strategy. Defense counsel used the pictures of J.A.'s cell phone to demonstrate that she was using her phone, checking voicemail, and text messaging during the period of time the State was alleging that J.A. was unconscious or incapacitated. He argued that J.A. could not have been incapacitated because she was functioning well enough to use her phone at various times throughout the evening. Although the strategy was ultimately unsuccessful, it was a legitimate trial strategy. Therefore, defense counsel's failure to move to have the pictures of J.A.'s cell phone excluded cannot form the basis for an ineffective assistance of counsel claim.

No. 44203-5-II

We affirm Chenault's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will instead be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Worswick, P.J.

_____
Sutton, J.