# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ALONCITA MONROE, an individual, ) | No. 76478-1-I |
| ) | |
| Appellant, ) | DIVISION ONE |
| ) | |
| v. ) | UNPUBLISHED OPINION |
| ) | |
| THE CITY OF SEATTLE, a municipal ) corporation, ) | FILED: August 6, 2018 |
| ) | |
| Respondent. ) | |

APPELWICK, C.J. — Monroe brought suit alleging failure to accommodate, disability discrimination and harassment, and retaliation. She argues that the trial court should have granted a new trial based on jury misconduct, that the trial court's jury instructions were in error, and that the trial court erroneously excluded hearsay. We affirm.

## FACTS

Aloncita Monroe was an employee of the City of Seattle (City) in the Public Utilities division. In 2011, she exhibited strange behavior at work. She appeared overly nervous, was using exaggerated hand gestures, and her pupils were constricted. The City ordered a fitness for duty exam[1] (FFDE). Monroe failed, in part because she tested positive for unprescribed drugs.

---

[1] An FFDE is a medical examination used to determine whether an employee can safely perform his or her job.

Monroe's physician informed the City that Monroe suffered from major depression and anxiety disorder. The physician's letter acknowledged that Monroe had used unprescribed medication to help deal with stress. And, the letter stated that Monroe's ability to function was limited due to her condition, especially with respect to front desk duties. The City agreed to accommodate her under the Americans with Disability Act[2] (ADA), by either providing reasonable accommodation for her within her current job title or another job title by identifying job vacancies with duties that she could perform.

The City began the accommodation process to find a suitable position for Monroe. It ultimately placed her in an Administrative Specialist I position with the Seattle Department of Transportation (SDOT), and her physician approved the job. Monroe began work in her new position on November 7, 2012. Her supervisor was Paul Jackson.

On February 8, 2013, Monroe's colleague who worked in the same office space observed Monroe acting strangely. That employee described her behavior as strange physical movements, walking aimlessly, staring at her computer monitor without producing work, gazing at the ceiling repeatedly, and talking and mumbling loudly to herself. Another colleague stated that Monroe made an odd request to ride along with SDOT crews, and was "dancing around his office in circles bobbing her head up and down."

Employees reported this to Jackson. After Jackson personally observed Monroe's behavior, he alerted the SDOT safety office. Safety Officer Scott Jensen,

---

[2] 42 U.S.C. §§ 12101-12213.

determined that an FFDE was warranted. Jackson and Jensen met with Monroe and told her that they were seeking an FFDE. Jackson and Jensen informed her that declining to undergo the FFDE could result in disciplinary action. They gave Monroe an opportunity to call her union representative from the privacy of another room, but she was unable to reach the union. Monroe decided to refuse the FFDE, and signed the consent form memorializing her refusal.[3]

After Jackson collected her belongings, Monroe went into the employee locker room. Jackson testified that he knocked on the locker room door after about 7 to 10 minutes, and when Monroe opened the door she was on the phone with her union representative. Monroe handed Jackson the phone, and the union representative stated that Monroe was ready to undergo the FFDE. Jackson responded that, because Monroe had already signed the form declining the FFDE, the FFDE was no longer possible unless he received instructions from his superiors. The union representative stated that someone would soon contact Jackson, and Jackson returned to his office.

After that, Jackson testified, Monroe could not be located at the office and her car was no longer in the parking lot. Monroe contradicted this. She testified that she then met Jackson in a common area, handed her badge to over him, and left the building. No FFDE occurred. Monroe was terminated.

---

[3] Monroe's testimony took a different tone. She testified that, when she was contemplating whether to accept or decline the FFDE, it seemed Jackson had "snapped" and that she was intimidated and fearful.

Monroe filed a complaint for damages under the Washington Law against Discrimination[4] (WLAD). She alleged failure to accommodate, discrimination based on disability, gender, and sex, a hostile work environment, and retaliation. The claims proceeded to trial, and the jury returned a verdict in favor of the City.

After the verdict, Monroe moved for a new trial. The motion was based on one juror's suspicions that the jury may have deliberated without him and Monroe's argument that the jury instructions were erroneous. The trial court denied the motion. Monroe appeals.

## DISCUSSION

Monroe makes four arguments. First, she argues that a new trial was warranted, because a juror provided a declaration that stated he believed that the other jurors deliberated without him. Second, she argues that jury instruction 13 misstated the law, because it stated that a disparate treatment plaintiff must be able to perform the essential functions of her job. Third, she argues that the trial court erred by not giving a jury instruction on implicit bias, pretext for termination, and the City's continuing duty to accommodate. Finally, she argues that the trial court erred in excluding evidence of the reputation and history of one of the City's key witnesses, Monroe's supervisor.[5]

---

[4] Ch. 49.60 RCW.

[5] She also seeks attorney fees if she prevails. But, because we affirm the trial court, Monroe is not entitled to attorney fees. Likewise, we need not address the City's cross appeal.

4

I.   Juror Misconduct

Monroe first argues that the trial court erred by denying a mistrial due to juror misconduct. That motion relied in part[6] on allegations of misconduct from one juror, who was the only African American juror. The facts alleged by that juror were as follows:

> I also[7] felt that there was misconduct in the jury deliberation process. We deliberated by going through the jury verdict form. The failure to accommodate claim was first. Three of us voted "yes," meaning we voted in favor of Ms. Monroe on that claim, which caused the group to go on to the next claim, and then come back and revisit the first claim. Each time three of us voted "yes." I voted in favor of a "yes" vote to each of the claims. We were told by Judge Erlick not to deliberate when anyone was out of the room. Toward the end of the morning, I went to the bathroom. I was in there for a few minutes. As I went to open the bathroom door to rejoin the group, I could hear the jurors talking, but I could not hear what was being said. When I opened the door, everyone stopped talking, and two of the jurors looked at me with guilty expressions. Then, someone said, "let's do another vote." Without any argument or explanation, one of the jurors who had voted "yes" with me on the first claim, switched her vote to "no." Within seconds, the foreperson hit the buzzer and we were done without further discussion. I felt like this was a rigged outcome, and that the group convinced her to change her mind out of my presence.

Monroe contends that this evidence warrants a new trial. The State responds that Monroe has provided no evidence of misconduct, but merely speculation. And, in any event, the State argues, any such misconduct would inhere in the verdict.

---

[6] The majority of the issues that Monroe raised in her motion for mistrial related to jury instructions and evidentiary decisions. But, on appeal, Monroe's mistrial argument is based solely on juror misconduct.

[7] The juror's declaration also stated that he felt the deliberations went too fast, and the jurors did not adequately consult exhibits. But, Monroe relies primarily on this quoted portion of the juror's declaration.

Courts generally do not inquire into the internal process by which the jury reaches its verdict. Breckenridge v. Valley Gen. Hosp., 150 Wn.2d 197, 204, 75 P.3d 944 (2003). In considering whether to declare a mistrial based on alleged juror misconduct, courts must ask whether the facts alleged "inhere in the verdict." Long v. Brusco Tug & Barge, Inc., 185 Wn.2d 127, 131, 368 P.3d 478 (2016). The party alleging such juror misconduct has the burden to show that misconduct occurred. State v. Hawkins, 72 Wn.2d 565, 566, 434 P.2d 584 (1967). A strong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank, and free discussion of the evidence by the jury. State v. Balisok, 123 Wn.2d 114, 117-18, 866 P.2d 631 (1994). Appellate courts analyze whether misconduct inheres in the verdict de novo. Long, 185 Wn.2d at 131.

The individual or collective thought processes leading to a verdict inhere in the verdict and cannot be used to impeach a jury verdict. Breckenridge, 150 Wn.2d at 204-05. Thus, a juror's postverdict statements regarding the way in which the jury reached its verdict cannot be used to support a motion for a new trial. Id. at 205.

Long presents an example of alleged misconduct that inheres in the verdict and does not warrant a new trial. The court was provided with "the somewhat conflicting declarations of four jurors, which characterize what one or two of their fellow jurors said based on their disclosed [life] experiences." 185 Wn.2d at 138. The court held that this did not warrant setting aside the verdict. Id. at 137. It cited the fact that the jurors' recollections of what occurred were conflicting. Id. at 138.

6

And, it went on to hold that setting aside a verdict based solely on jurors offering their own life experiences was not warranted in light of the policy in favor of stable verdicts. Id.

The evidence does not warrant setting aside the verdict here, either. Monroe offers a single declaration that is based on suspicion alone as to what was discussed. The juror did not hear a discussion. He did not have knowledge that a discussion of issues did occur. He infers that it did from the expressions on other jurors' faces when he returned. This does not amount to the "strong, affirmative showing" of misconduct necessary to overcome the policy in favor of stable verdicts.[8] Monroe cites no case where a court has ever afforded such relief based on mere suspicion that misconduct of this nature may have occurred. Monroe does not carry her heavy burden to disturb the jury's verdict.[9]

## II.  Jury Instructions

Monroe argues that the trial court erred in instructing the jury. First, she argues that instruction 13 misstated the law. Second, she argues that the trial

---

[8] Monroe also contends that the jury's conduct violated RCW 4.44.300. That statute permits a jury to separate unless good cause is shown to sequester the jury. Id. Our Supreme Court has instructed that if a jury is separated in violation of RCW 4.44.300, a presumption arises that the defendant has been prejudiced. State v. Smalls, 99 Wn.2d 755, 766, 665 P.2d 384 (1983). Monroe claims that she is entitled to this presumption. But, here one juror left merely to use the restroom. Monroe has not established that RCW 4.44.300 was violated.

[9] Monroe seems to suggest in her brief that an evidentiary hearing would be warranted. But, she did not request one. Her motion below sought a new trial. Her assignment of error clearly states, "The trial court erred in denying plaintiff a new trial based on juror misconduct." The trial court's decision being reviewed is whether it erred in denying a mistrial. Whether further fact finding was warranted is not before us.

court erred by not giving additional jury instructions on: (1) implicit bias, (2) pretext for termination, and (3) an employer's continuing duty to accommodate.

A. Misstatement of Law: "Essential Functions"

Monroe argues that instruction 13 misstated the law. That instruction set forth the elements of Monroe's disability discrimination claim: (1) that Monroe has a disability, (2) that she was able to "perform the essential functions of the job in question with reasonable accommodation," and that (3) the disability was a substantial factor in her termination. Monroe argues that this instruction was error, because it included the "essential functions" element. This court reviews whether a jury instruction reflects an accurate statement of the law de novo. Gregoire v. City of Oak Harbor, 170 Wn.2d 628, 635, 244 P.3d 924 (2010).

Instruction 13 matched, verbatim, 6A Washington Practice: Washington Pattern Jury Instructions: Civil 330.32, at 375 (6th ed. 2012) (WPI). Monroe acknowledges this. Thus, her argument is that WPI 330.32 misstates Washington law.

In support of this argument, Monroe cites Johnson v. Chevron U.S.A., Inc., 159 Wn. App. 18, 33, 244 P.3d 438 (2010). In that case, Johnson alleged that his former employer discharged him due to his disability and race. Id. at 21. In addressing whether the jury was properly instructed, the court reasoned that "Johnson was required to prove only that his race or disability was a substantial factor in Chevron's decisions." Id. at 33.

Monroe argues that this quote establishes that an employee need not also prove that he or she could perform the essential functions of his or her job. But,

the context of the quote shows otherwise. The court made the statement in holding that it was error to require Johnson to prove that he was treated differently than other employees. Id. at 32-33. And, although the instructions included an essential functions element, the court did not address that portion of the instructions, and thus did not hold that it was error. Id. at 32 n.31, 33.

And, the essential functions element is drawn from another case, Havlina v. Dep't of Transp., 142 Wn. App. 510, 517, 178 P.3d 354 (2007). There, the Court reasoned that "WLAD's prohibition against disability discrimination does not apply if the disability prevents the employee from properly performing his job." Id. And, it specifically mentioned essential functions: "If an employee is not able to perform the essential functions of his job, the agency's responsibility to accommodate the employee is limited to making a 'good faith' effort to locate a job opening for which the employee is qualified." Id. (emphasis added).

Under Havlina, WPI 330.32 does not misstate the law. The trial court's inclusion of an essential functions element in instruction 13 was not error.

B. Jury Instructions not Given

Monroe argues that the trial court erred by not instructing the jury on: (1) implicit bias, (2) pretext for termination, and (3) the employer's continuing duty to accommodate. A trial court's decision on whether to give a particular instruction is reviewed for an abuse of discretion. Terrell v. Hamilton, 190 Wn. App. 489, 498, 358 P.3d 453 (2015)

### 1. Implicit Bias

Monroe argues that the facts of this case warranted an implicit bias instruction to the jury, because, among other things, Monroe is an African American plaintiff, and there was only one juror who was African American. Washington courts have recently expressed concern over implicit bias that can affect the equitable administration of justice. See, e.g., In re Marriage of Black, 188 Wn.2d 114, 134-35, 392 P.3d 1041 (2017) (holding that implicit biases affected a judgment); State v. Saintcalle, 178 Wn.2d 34, 49, 309 P.3d 326 (2013) ("[W]e should recognize the challenge presented by unconscious stereotyping in jury selection and rise to meet it."), abrogated on other grounds by City of Seattle v. Erickson, 188 Wn.2d 721, 734-35, 398 P.3d 1124 (2017).

But, this instruction is similar in substance to instruction one, which instructed jurors to "reach your decision based on the facts proved to you and on the law given to you, not sympathy, bias, or personal preference." Monroe cites no Washington authority that has ever found error in not giving an implicit bias instruction. And, Monroe was able to and did address her implicit bias theory in her closing argument. The trial court did not abuse its discretion in declining to give the instruction.

### 2. Pretext

Monroe further argues that the trial court should have given an instruction on the possibility of using a false pretext for firing an employee due to a disability. Monroe's offered pretext instruction stated, "You may find that the plaintiff's disability was a substantial factor in the defendant's decision terminate [sic] the

plaintiff if it has been proved that the defendant' [sic] stated reasons for the decision is [sic] not the real reasons, but is a pretext to hide disability discrimination." Monroe argues that, because of the paucity of African American jurors and the lack of an implicit bias instruction, the pretext instruction "would have helped the jury connect the dots to a discriminatory motive."

Monroe argues that this case warrants a different result than Farah v. Hertz Transporting, Inc., 196 Wn. App. 171, 383 P.3d 552 (2016), review denied, 187 Wn.2d 1023, 390 P.2d 332 (2017). There, Farah and his co-plaintiffs were "shuttlers" for Hertz Transporting at Sea-Tac airport. Id. at 174. They brought suit against Hertz for nationality and religious discrimination, because Hertz required them to clock out while engaging in their Muslim prayers. Id. at 175. Farah unsuccessfully requested a pretext instruction nearly identical to the pretext instruction requested by Monroe, except the term "disability" was replaced by "religion or national origin." Id. at 177. The Court of Appeals surveyed competing federal decisions, some of which endorsed the instruction, and some of which held that the instruction might confuse the jury. Id. at 179-80. It ultimately held that, "while the instruction might be appropriate, the arguments in its favor are not compelling enough to hold that it is an abuse of discretion to refuse to give the instruction." Id. at 181.

The same is true here. To the extent that Monroe's theory of the case was that the City had presented a pretextual reason for terminating her, she had the opportunity to present that theory during her case in chief. And, in her closing arguments, she articulated her theory of pretext to the jury.

The trial court did not abuse its discretion in denying Monroe's proposed pretext instruction.

### 3. Continuing Duty to Accommodate

Monroe also contends that the trial court should have given an instruction that explicitly informed the jury about the City's continuing duty to accommodate. Monroe's proposed instruction 30 stated,

> The duty to accommodate is a continuing duty that is not exhausted by one effort. Trial and error may be necessary as part of the interactive process to satisfy the employer's burden. The employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed.

> If a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship. The employer has an obligation to affirmatively take steps to help the disabled employee continue working at the existing position or attempt to find a position compatible with the limitations.

The trial court declined to give the instruction, because it believed this issue was adequately addressed in instruction 10. Instruction 10 stated that "[a]n employer must provide a reasonable accommodation for an employee with a disability. . . The obligation to reasonably accommodate applies to all aspects of employment, and . . . . [t]here may be more than one reasonable accommodation of a disability."

Monroe's argument on this continuing duty instruction fails. First, instruction 10 was a correct statement of the law. No Washington case has found an abuse of discretion for not using continuing duty to accommodate language in the jury

instruction. She instead cites a single federal case, <u>Humphrey v. Mem'l Hosps. Ass'n</u>, 239 F.3d 1128, 1138 (9th Cir. 2001), where the court observed that employers have a continuing duty to accommodate. That a federal court made this comment does not establish that the trial court here abused its discretion in not giving a continuing duty instruction.

Second, Monroe was able to argue her theory of the case without the proposed instruction 30. In closing argument, she quoted the City's disability resource guide: " 'The obligation to provide reasonable accommodation is on-going and may arise at any time during an individual's employment.' " She also stated in closing that "she was not succeeding, and they needed the right to accommodation [sic], it is on-going, they needed to give her that accommodation."

We hold that the trial court did not abuse its discretion in denying any of Monroe's proposed instructions.

III. <u>Exclusion of Evidence about Supervisor</u>

Monroe next argues that the trial court erred in excluding evidence related to Jackson, who was her supervisor and also one of the City's key witnesses.

The trial court redacted an e-mail in which Monroe stated that she had heard rumors that Jackson had a history of sexual harassment with females.

In another writing, Monroe referenced Jackson being a "womanizer and a big bully," Jackson asking if Monroe was married, and Monroe catching Jackson staring at her. The trial court redacted these references, as well. It found the evidence should be excluded under ER 403, in part because Monroe's sexual

discrimination claim had been dismissed and because Monroe had already established her concerns about Jackson's behavior.[10]

Under ER 403, a trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice or because it is cumulative. This court gives a trial court considerable discretion in applying ER 403. Carson v. Fine, 123 Wn.2d 206, 226, 867 P.2d 610 (1994). It will reverse an ER 403 decision only in the exceptional circumstance of a manifest abuse of discretion. Id.

Monroe points out that the evidence of stories she had heard about Jackson and her own experiences interacting with Jackson would have given better context for her actions. But, she was not denied the opportunity to explain her actions. In her trial testimony about the events leading to her termination, Monroe testified, "I never had a man of Paul's size be rude to me or disrespectful to me." She testified that he raised his voice to a level she had never heard, and she felt intimidated.

Here, Monroe's sexual discrimination claim had been dismissed. Only the evidence going to the dismissed claim was excluded. Absent that claim, evidence of prior uncomfortable or inappropriate encounters of a sexual nature between

---

[10] In her brief, Monroe contends that the trial court excluded the evidence as hearsay. The record shows that the City moved to exclude in part based on hearsay, but it primarily argued that the statements' "tiny probative value . . . is overwhelmed by the unfair prejudice." And, the trial court did not discuss the hearsay argument at length, but cited ER 403 and mentioned that the evidence "opens up a whole . . . collateral can of worms," and "I think you have established her concerns [about Jackson]." This shows that the trial court excluded the evidence based on ER 403. Hearsay was, at most, a secondary ground for the ruling.

Jackson and Monroe, or rumors about Jackson's personal conduct, would have been highly prejudicial to the City.[11]

The trial court did not violate its considerable discretion in applying ER 403.

We affirm.

WE CONCUR:

_____

_____

_____

---

[11] Monroe also argues that the evidence should have been admitted because it was critical to proving her retaliation claim. But, as the City points out, instruction 17 required Monroe to prove only that (1) she requested an accommodation due to disability or made a complaint about conduct, and (2) that request or complaint was a substantial factor in her termination. It did not require Monroe to specifically prove that her complaint related to protected conduct. Thus, any evidence that Monroe made a complaint about conduct was necessarily about protected conduct. The evidence was not necessary for the retaliation claim, and the trial court did not abuse its discretion in excluding it.